# STATE OF MICHIGAN

# COURT OF APPEALS

FORD MOTOR CO. and FORD PARTS &
SERVICES DIVISION,

       Plaintiffs-Appellees,

v

DEPARTMENT OF TREASURY,

       Defendant-Appellant.

FOR PUBLICATION
December 15, 2015
9:05 a.m.

No. 322673
Court of Claims
LC No. 09-000105-MT

Before: GADOLA, P.J., and K. F. KELLY and FORT HOOD, JJ.

GADOLA, P.J.

This case arises from Ford Motor Company and Ford Parts & Services Division's (collectively "Ford") challenge to an assessment by the Department of Treasury (the Department) under Michigan's Use Tax Act (UTA), MCL 205.91 *et seq.*[1] On June 25, 2014, the Court of Claims issued an order closing the case, which the Department appeals as of right. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND FACTS

This case began when the Department conducted a tax audit of Ford for the period of July 1, 1993 through November 30, 2001. During part of the audit period, the UTA provided a use tax exemption for eligible property used or consumed in industrial processing, but stated that such property did not include "vehicles licensed and titled for use on public highways." MCL 205.94(g)(*i*), as amended by 1989 PA 141. In 1999, the Legislature amended the UTA to provide that the industrial processing exemption excluded "[v]ehicles . . . required to display a vehicle permit or license plate to operate on public highways, *except for a vehicle bearing a manufacturer's plate . . . .*" MCL 205.94o(5)(g), added by 1999 PA 117 (emphasis added).

---

[1] "[U]se tax is a tax imposed 'for the privilege of using, storing, or consuming tangible personal property in this state . . . .' " *WMS Gaming, Inc v Dep't of Treasury*, 274 Mich App 440, 442-443; 733 NW2d 97 (2007), quoting MCL 205.93(1).

On January 28, 1999, Ford sent two letters to the Department, asserting that the vehicles it manufactured or purchased from competitors for test purposes, which displayed manufacturer's license plates when operated on public highways, were exempt from use tax under former MCL 205.94(g)(*i*). Ford stated that it intended "to file for a refund of any tax accrued and paid (if any) on the use of such vehicles in Michigan." The Department took the position that Ford's test vehicles purchased or manufactured before the 1999 amendment took effect were subject to use tax as vehicles "licensed and titled for use on public highways."

The Department completed its audit and issued a final tax assessment of approximately $10.7 million for unpaid taxes and accrued interest, which Ford paid under protest. In July 2006, Ford filed suit against the Department, asserting that its test vehicles were exempt from use tax under former MCL 205.94(g)(*i*). Ford later amended its complaint to add a claim challenging the Department's assessment of use tax on automotive parts independent Ford dealers sold to consumers under extended service plans (ESPs). Ford argued that it was not liable to pay use tax on the automotive parts because it did not own, possess, use, store, or consume the parts.

In June 2009, Ford filed a complaint seeking a declaratory judgment in a separate action, alleging that in December 2008, the Department issued a second tax assessment for approximately $29 million in use taxes and $15 million in interest covering the same years at issue in the audit. The Department filed a motion for summary disposition, arguing that the Court of Claims lacked subject-matter jurisdiction for several reasons including Ford's failure to exhaust administrative remedies. Ford also filed a motion for summary disposition under MCR 2.116(I)(2), asking the Court of Claims to declare that it had subject-matter jurisdiction over the action and that the Department lacked authority to issue a second tax assessment.

## A. SUMMARY DISPOSITION REGARDING EXTENDED SERVICE PLANS AND ASSOCIATED SANCTIONS

While the motions in the 2009 action were pending, Ford filed two motions for partial summary disposition in the 2006 action. First, Ford filed a motion for summary disposition under MCR 2.116(C)(10) with respect to the Department's assessment of use tax for automotive parts that Ford dealers supplied to consumers under ESPs. On March 22, 2010, the Court of Claims granted Ford's motion, concluding that Ford did not use, store, or consume the parts, and that Ford's reimbursement to Ford dealers for repairs under ESPs was no different than a consumer purchase, so the dealer was responsible for remitting sales tax. The Court of Claims concluded that the Department had "no basis from which to charge [Ford] use tax on the repair costs paid by [Ford]," and ordered the Department to refund Ford approximately $1.6 million plus interest. The court further ordered the Department to pay Ford's costs and attorney fees "pursuant to MCR 2.114 and MCR 2.625, as [the Department] relied upon a frivolous defense." Ford submitted a request for $152,140.92 in attorney fees and $5,014.95 in costs, to which the Department objected. On January 5, 2011, the court awarded Ford $112,256.73 plus interest.

On November 9, 2011, Ford moved for a show cause order regarding the Department's failure to pay the January 5, 2011 award and the March 22, 2010 refund. The Department argued

that under MCR 7.101(H)(1),[2] an order or judgment cannot be enforced until the time for taking an appeal has expired. Ford replied that the Department's position was meritless because MCR 7.101(H) only governed appeals to circuit courts. The Court of Claims ordered the Department to issue the required payments by November 23, 2011, and awarded Ford attorney fees and costs associated with the motion to show cause. The Department stipulated to the reasonableness of Ford's bill of costs while preserving its challenge to the appropriateness of the award.

## B. SUMMARY DISPOSITION REGARDING FORD'S TEST VEHICLES AND ASSOCIATED SANCTIONS

Ford also filed a motion for summary disposition under MCR 2.116(C)(10) with respect to the Department's assessment of use tax on its test vehicles under former MCL 205.94(g)(*i*). The Department argued that Ford was required to title the vehicles that it manufactured for its own testing, and that the vehicles were licensed because they were driven under manufacturer's license plates. At oral argument, the Department conceded that Ford's untitled test vehicles were not subject to use tax. The Court of Claims granted Ford's motion for summary disposition, concluding that a manufacturer's license plate was not a "license" under former MCL 205.94(g)(*i*) because it could be used interchangeably among test vehicles and was issued to the manufacturer, rather than a specific vehicle. The court ordered the Department to refund Ford the use tax and deficiency interest paid under protest with regard to Ford's test vehicles.

On February 8, 2012, Ford filed an emergency ex parte motion to prevent the Department from sending its multi-million dollar refund checks by mail. Ford asserted that its counsel was "reluctant to trust $24 million in refunds to the mail and delivery to a general mailbox at Ford," and requested that she be allowed to personally retrieve the checks on Ford's behalf. The Department responded that it would follow its "normal procedure," which was to mail the checks to the taxpayer's legal address. The Court of Claims granted Ford's motion and awarded Ford associated attorney fees and costs. The Department stipulated to the reasonableness of Ford's costs and attorney fees, but preserved its right to challenge the appropriateness of the award.

## C. SUMMARY DISPOSITION REGARDING THE 2009 ACTION AND ASSOCIATED SANCTIONS

In December 2011, the Court of Claims held a hearing on Ford's and the Department's motions for summary disposition in the 2009 action. At the hearing, the Department explained that it had reduced the second tax assessment from $44 million to $13 million "based upon information that [the Department] obtained in the other matter that was being litigated." The Court of Claims inquired whether the tax issues in the case were identical to those litigated in the 2006 action, and the Department's counsel admitted the court was "[b]asically . . . correct" and that the issues had already been decided in Ford's favor in the 2006 action. The court then

---

[2] MCR 7.101(H)(1) has since been replaced by MCR 7.108(B)(1).

granted Ford's motion to consolidate the 2009 case with the 2006 case, and denied the Department's motion for summary disposition.

Thereafter, Ford filed a motion under MCR 2.114(E) and (F), MCR 2.625(A), and MCL 600.2591 for costs and attorney fees incurred in the 2009 action. Although the Department stipulated to an order cancelling and rescinding the second tax assessment, it argued that its actions were not frivolous because it did not intend to harass, embarrass, or injure Ford. The Court of Claims found that the Department's actions were "frivolous and vexatious" and ordered that "for these reasons and those stated on the record," the Department was liable for actual and exemplary damages, including Ford's costs and attorney fees. The Department stipulated to the reasonableness of the award, but reserved the right to challenge the appropriateness of the award.

## D. INTEREST ACCRUAL ON THE TEST VEHICLE REFUND CLAIM

In January 2014, Ford filed a motion for partial summary disposition regarding the date on which interest on its test vehicle refund claim began to accrue. Ford contended that it filed its refund claim on January 28, 1999, when it sent two letters asking the Department to credit the refunds against any deficiencies in the then ongoing tax audit. The Department argued that the letters were inadequate notice of a claim for a refund to start the 45-day period after which interest would accrue. The Court of Claims concluded that under the "adequate notice" standard from *Lindsay Anderson Sugar Trust v Dep't of Treasury*, 204 Mich App 128; 514 NW2d 514 (1994), the January 1999 letters constituted adequate notice of a claim. The Department filed a motion for reconsideration, which the court denied.

## II. THE INDUSTRIAL PROCESSING EXEMPTION

The Department first argues that the Court of Claims erred by concluding that Ford's test vehicles that were titled and driven under manufacturer's license plates were not "licensed . . . for use on public highways," and therefore were exempt from use tax under former MCL 205.94(g)(*i*). We agree.

We review a trial court's decision on a motion for summary disposition de novo. *Willet v Waterford Charter Twp*, 271 Mich App 38, 45; 718 NW2d 386 (2006). We review questions of statutory interpretation de novo. *Green Oak Twp v Munzel*, 255 Mich App 235, 238; 661 NW2d 243 (2003). "Where a statute does not define a term, [courts] will construe it in accordance with its ordinary and generally accepted meaning." *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 604; 575 NW2d 751 (1998). If the plain and ordinary meaning of statutory language is clear, judicial construction is not permitted. *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005).

Before the 1999 amendment of the UTA took effect, former MCL 205.94(g)(*i*) provided that "[p]roperty used or consumed in industrial processing does not include . . . vehicles licensed and titled for use on public highways." The UTA does not define the word "licensed." Courts may rely on dictionary definitions to ascertain the plain and ordinary meaning of undefined statutory terms. *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004). *Merriam-Webster's Collegiate Dictionary* (11th ed) defines the transitive verb "licensed" as "to permit or

authorize esp. by formal license." Ford's test vehicles were "licensed" because they were driven under manufacturer's license plates that authorized their use on public highways.[3]

Ford contends that manufacturer's license plates did not license its test vehicles for use on public highways, but rather licensed Ford to test the vehicles. The Motor Vehicle Code (MVC) provides the following regarding manufacturer's license plates:

> A manufacturer owning a vehicle of a type otherwise required to be registered under this act may operate or move the vehicle upon a street or highway primarily for the purposes of transporting or testing . . . if the vehicle displays, in the manner prescribed [MCL 257.225], 1 special plate approved by the secretary of state. [MCL 257.244(1).]

A manufacturer's license plate is a physical representation that a vehicle is authorized to operate on public highways. Therefore, when a manufacturer's license plate is affixed to a test vehicle, the vehicle becomes "licensed . . . for use on public highways." MCL 205.94(g)(*i*).

Ford argues that its test vehicles were not licensed because a manufacturer's license plate is not assigned to a specific vehicle and may be legally interchanged among test vehicles. The fact that a manufacturer's license plate is interchangeable has no effect on the fact that a vehicle displaying a plate becomes "licensed . . . for use on public highways." Ford contends that it cannot "license" its own test vehicles by affixing a manufacturer's license plate because only the Secretary of State can license vehicles. However, the Secretary of State, not Ford, issued the manufacturer's license plates authorizing Ford to operate the test vehicles on public highways.

Ford contends that a vehicle is only licensed if it meets the registration and certificate of title provisions of MCL 257.216.[4] However, MCL 257.216(a) exempts from registration requirements "[a] vehicle driven or moved on a street or highway in conformance with the provisions of this act relating to manufacturers . . . ." Therefore, Ford's test vehicles driven under manufacturer's license plates need not comply with the MVC's registration provisions. Ford's argument also tacitly assumes that there is only one way to license a vehicle for use on

---

[3] On appeal, both parties discuss whether the term "licensed" should be interpreted in light of the Motor Vehicle Code (MVC), which does not define the word "licensed" but instead defines the word "license" to mean "any driving privileges, license, temporary instruction permit, commercial learner's permit, or temporary license issued under the law of this state pertaining to *the licensing of persons* to operate motor vehicles." MCL 257.25 (emphasis added). Both Ford and the Department agree that the MVC defines the word "license" only in reference to persons, rather than vehicles, so any reference to the MVC is not helpful is discerning the meaning of the word "licensed" as used in the UTA.

[4] MCL 257.216 does not specifically reference "licensing" a motor vehicle but instead provides: "Every motor vehicle . . . when driven or moved on a street or highway, is subject to the registration and certificate of title provisions of this act . . . ."

public highways, which is clearly not the case because MCL 257.244(1) allows a manufacturer that owns a vehicle "otherwise required to be registered" to "operate . . . the vehicle upon a street or highway . . . if the vehicle displays . . . 1 special plate approved by the secretary of state."

Ford argues that its test vehicles were not licensed *for use* on public highways because Ford could not lawfully sell, lease, or lend a test vehicle to a third party or use a test vehicle for any purpose other than testing. The UTA defines "use" as "the exercise of a right or power over tangible personal property incident to the ownership of that property including transfer of the property in a transaction where possession is given." MCL 205.92(b). Manufacturer's license plates specifically authorize Ford to "operate or move the vehicle upon a street or highway." MCL 257.244(1). The mere fact that Ford could not sell or lease the vehicles, or use them for purposes other than testing, does not mean that the vehicles were not licensed for use.

Alternatively, Ford argues that we should retroactively apply the Legislature's 1999 amendment of the UTA. Generally, statutory amendments are only applied prospectively unless the Legislature expressly or impliedly identified its intention to give the amendment retrospective effect. *GMAC LLC v Dep't of Treasury*, 286 Mich App 365, 377; 781 NW2d 310 (2009). "An amendment may apply retroactively where the Legislature enacts an amendment to clarify an existing statute . . . ." *Mtg Electronic Registration Sys, Inc v Pickrell*, 271 Mich App 119, 126; 721 NW2d 276 (2006).

Ford argues that legislative analysis for the 1999 amendment mentioned extending exemptions to certain "third parties," but otherwise spoke of clarifying the Act. House Legislative Analysis Section, HB 4744, HB 4745, and SB 544, (July 16, 1999), p 11. However, staff-prepared legislative analysis does not "summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process" and therefore "should be accorded very little significance by courts when construing a statute." *In re Certified Question*, 468 Mich 109, 115 n 5, 659 NW2d 597 (2003).

Additionally, Ford argues that the 1999 amendment merely clarified existing law because it gave the phrase "vehicles licensed . . . for use on public highways" the same meaning that it has in other parts of Michigan tax law.[5] Ford contends that every other time the phrase "vehicles licensed . . . for use on public highways" is used, it refers to licensing vehicles under MCL 257.216, and the manufacturer's license plate provisions of the MVC do not apply. As discussed above, MCL 257.216 relates to registrations and certificates of title, not specifically to a "license" as defined by the MVC. Further, the specific tax exemption relating to industrial processing is the only place that manufacturer's license plates would be relevant because only a manufacturer, as opposed to a consumer, would engage in industrial processing.

---

[5]   See, e.g., MCL 205.54a(1)(b)(*ii*) (stating that sales of tangible property to a religious organization are exempt from sales tax except for the sale of "vehicles licensed for use on public highways other than a passenger van or bus with a manufacturer's rated seating capacity of 10 or more that is used primarily for the transportation of persons for religious purposes").

The first enacting section of 1999 PA 117 lists several clarifications of the UTA, without mentioning the tax exemption for vehicles displaying manufacturer's license plates. 1999 PA 117, enacting § 1. Thus, it is not clear that the Legislature intended to clarify the industrial processing exemption with regard to vehicles using a manufacturer's license plate. Moreover, Section 4o of the amendment, which contains the manufacturer's license plate provision, provides that tax levied under the UTA did not apply to property sold "after March 30, 1999," indicating that the Legislature intended the relevant portion of the 1999 amendment to apply prospectively. Accordingly, we decline to retroactively apply the 1999 amendment of the UTA.

## III. ATTORNEY FEES AND COSTS

The Department next challenges four separate awards of attorney fees and costs. We review a trial court's award of attorney fees and costs for an abuse of discretion. *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008) (opinion by TAYLOR, C.J.). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id.* We review a trial court's determination that a claim or defense was frivolous for clear error. *Szymanski v Brown*, 221 Mich App 423, 436; 562 NW2d 212 (1997). A decision is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made. *Id.*

## A. ATTORNEY FEES AND COSTS ASSOCIATED WITH THE ESP ISSUE

The Department first challenges the Court of Claims' conclusion that the Department's defense of its assessment of use tax for automotive parts provided under ESPs was frivolous. A court may find that a party's action is frivolous if (1) the party initiated the suit for purposes of harassment, (2) "[t]he party's legal position was devoid of arguable legal merit," or (3) "[t]he party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true." MCL 600.2591(3)(a). "A claim is not frivolous merely because the party advancing the claim does not prevail on it." *Adamo Demolition Co v Dep't of Treasury*, 303 Mich App 356, 368; 844 NW2d 143 (2013). A claim is devoid of arguable legal merit if it is not sufficiently grounded in the law or fact. *Id.* at 369.

The Department argues that the Court of Claims did not make sufficient factual findings to justify its determination that the Department's defense was frivolous. Court rules require trial courts to place findings of fact and conclusions of law on the record. MCR 2.517(A)(1); *Morris v Clawson Tank Co*, 459 Mich 256, 274; 587 NW2d 253 (1998). Findings of fact are sufficient if they are "[b]rief, definite, and pertinent," MCR 2.517(A)(2), and "it appears that the trial court was aware of the issues in the case and correctly applied the law, and where appellate review would not be facilitated by requiring further explanation," *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 176; 530 NW2d 772 (1995).

The court's order stated that the Department was required to pay Ford's costs and attorney fees "pursuant to MCR 2.114 and MCR 2.625, as [the Department] relied upon a frivolous defense." Although the court did not mention its specific findings regarding the frivolousness of the defense in its order, during a subsequent hearing on the Department's motion to stay the order, the court stated the following:

It is sad to hear that [the Department] thinks that because of this ruling they would be afraid to file other cases because of fear of retribution or fear of the courts awarding costs and sanctions, attorney fees, what have you. I think the opposite is sad, that [the Department] should have free license to simply file a suit without proper cause or good showing of a meritorious case, without appropriate factual and legal support. That puts the burden on the taxpayer. Not all taxpayers have deep pockets like Ford and I don't think anybody, even Ford, these days have deep pockets.

Therefore, the court awarded Ford costs and attorney fees because it believed the Department's use tax assessment for automotive parts provided under ESPs lacked factual and legal support. Although the court's explanation occurred in relation to a separate motion, a finding that is "[b]rief, definite, and pertinent," MCR 2.517(A)(2), is sufficient, and the court's statement in this matter was adequate to facilitate appellate review.

Further, the Department's defense was frivolous. Under MCL 205.93, the state imposes use tax on a person that uses, stores, or consumes tangible personal property. The Department's auditor, George Tetteh, admitted that there was no evidence that Ford used, stored, or consumed the repair parts. Tetteh explained that Ford dealers purchased the parts and customers took the parts after the dealer installed them on the customer's vehicle. Tetteh also admitted that he did not have "any particular or specific document . . . to show that . . . the dealers were an agent of Ford." Accordingly, the Department's defense lacked any factual or legal support.

The Department argues that the court's award of $112,256.73 was unreasonable. To ascertain a reasonable attorney fee, courts begin by determining the fee customarily charged in the locality for similar legal services. *Khouri*, 481 Mich at 530. To determine this amount, courts should use "reliable surveys or other credible evidence of the legal market." *Id*. at 530-531. Then, the reasonable hourly rate should be multiplied by the reasonable number of hours expended to reach a baseline figure for a reasonable attorney fee. *Id*. at 533. Courts should make adjustments to the figure based on the factors from MRPC 1.5(a) and *Wood v Detroit Automobile Inter-Ins Exch*, 413 Mich 573; 321 NW2d 653 (1982). *Khouri*, 481 Mich at 532.

The Department first argues that the Court of Claims erred by "presuming" the reasonableness of the fees assessed for all of Ford's attorneys based on the reasonableness of the fees for Ford's lead counsel. The court stated that it was "overly burdensome" to determine the reasonableness of the fees charged by each attorney that worked on the case from its inception. Instead, the court stated that it looked "to the fees from [Ford's] lead attorney, Loren Opper," and then "presumed" that the fees for the other attorneys were reasonable based on Opper's fees. However, the court also stated that it reviewed the fees and hours for the other attorneys in preparation for the evidentiary hearing, so its decision was based on evidence.

The Department contends that the court did not attempt to determine the reasonableness of the hours spent on the ESP issue. To the contrary, the court found that the Department conceded to the reasonableness of the time spent on affidavits, the brief, and the motion and argument, and that Ford's request for 25% of the time it spent on various categories such as the amended complaint, research, and discovery was appropriate because the ESP issue increased the amount of time spent in those categories. The court further found that the time spent on some

categories, such as depositions and documents, was not reasonable because Ford would have incurred those expenses regardless of whether the ESP issue was in dispute. Therefore, the Court of Claims did not fail to consider the reasonableness of the hours billed.

The Department contends that the Court of Claims erred by awarding Ford attorney fees for time spent on the amended complaint, because the fees were supposed to go toward "whatever was expended in relation to the motion for partial summary disposition" and "not on the whole case." On this point, we agree. Time spent on the amended complaint could not have been spent "in relation to the motion for partial summary disposition" that followed the complaint. Therefore, the trial court abused its discretion by awarding attorney fees for time Ford spent on the amended complaint.

The Department challenges the court's determination that Opper, Ford's lead attorney, charged a reasonable rate. Specifically, the Department argues that Opper's hourly rate was contradicted by the State Bar of Michigan Economics of Law Practice Survey and that the court improperly considered Detroit rather than Lansing as the locality on which to base the rate. At the evidentiary hearing, Ford's counsel noted that the 2007 Economics of Law Practice Survey had no participants in the category of "tax problem resolution," which was the relevant area of practice. In lieu of the State Bar's survey, Ford submitted surveys from PricewaterhouseCoopers and the National Law Journal to demonstrate that Ford's hourly rates were reasonable.

In finding that Opper's hourly rates were reasonable, the court stated that the case involved "complex litigation in state and local taxation," which was a "specialized area of law" that a limited number of Michigan firms practice, and that the hourly rates were reasonable because they were "in line with rates charged in the Detroit region for experienced attorneys performing specialized complex litigation." The Department has not shown an abuse of discretion because the Court of Claims could determine the reasonableness of Opper's rates based on the surveys Ford submitted at the evidentiary hearing. Additionally, Opper testified that he interfaced with Ford through his firm's Detroit office, so the court did not abuse its discretion by determining that Detroit was the appropriate locality upon which to base the rates.

The Department asserts that the court ignored MCL 600.2421c(4), which caps attorney fees against the state at $75 per hour. However, the Department abandoned this issue by providing only one sentence of analysis in its appellate brief. *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). Moreover, the argument is meritless. The Court of Claims awarded Ford attorney fees under MCL 600.2591, not MCL 600.2421c(4). Additionally, Ford is not a "party" as defined in MCL 600.2421b(2) because it is a corporation with more than 250 employees, so it was not subject to the award restrictions in MCL 600.2421c(4).

## B. ATTORNEY FEES AND COSTS ASSOCIATED WITH THE 2009 ACTION

Next, the Department argues that the Court of Claims clearly erred by finding that its defense of the $44 million dollar second tax assessment was frivolous. The court's order specifically stated that the award of attorney fees was appropriate under MCR 2.114(E)-(F), MCR 2.625(A)(2), and MCL 600.2591 because the Department's actions were "frivolous and vexatious." There is no dispute that the Department's $44 million second tax assessment was improper because the Department stipulated to an order cancelling and rescinding the assessment

-9-

and acknowledging that it should not have been assessed.  At the motion hearing for summary disposition in the 2009 action, the Department's counsel admitted that the court was "[b]asically . . . correct" in its contention that the 2009 action involved the same matters litigated in the 2006 action, which had already been decided in Ford's favor.  When asked whether the Department was responsible to verify the facts underlying the second tax assessment, the Department's audit specialist, Carla Ward, stated, "If the department does not feel they're getting the information that they need, then they have the authority to issue an assessment."  These statements all support Ford's contention that the Department issued the second tax assessment to harass Ford.  Accordingly, the Court of Claims did not clearly err by finding that the Department's defense was frivolous, and properly awarded attorney fees.

## C.  ATTORNEY FEES AND COSTS ASSOCIATED WITH FORD'S EMERGENCY EX PARTE MOTION

The Department contends that the Court of Claims abused its discretion by awarding attorney fees for Ford's ex parte motion to prevent the Department from sending its multi-million dollar refund checks through the mail.  Although the court did not specify the grounds on which it awarded the fees, it is clear from the context of the ex parte motion and Ford's arguments that the court agreed that the Department's refusal to let Ford's counsel personally pick up the multi-million dollar checks was unreasonable.  Given the amount at issue, this is a sound conclusion.  Trial courts have inherent authority to impose sanctions on the basis of a party's misconduct.  *Persichini v William Beaumont Hosp*, 238 Mich App 626, 639; 607 NW2d 100 (1999).  Therefore, the Court of Claims did not abuse its discretion by awarding attorney fees for Ford's emergency ex parte motion.

## D.  ATTORNEY FEES AND COSTS ASSOCIATED WITH FORD'S MOTION TO SHOW CAUSE

The Department argues that the Court of Claims abused its discretion by awarding attorney fees for Ford's motion to show cause regarding the Department's failure to pay the tax refund on the ESP issue.  The Department argued that under MCR 7.101(H)(1), an order or judgment cannot be enforced until the time for taking an appeal expired, but Ford replied that MCR 7.101(H)(1) only governed appeals from district or probate courts to circuit courts.

Litigants are required to obey court orders, regardless of their propriety, until the orders are dissolved.  *Plumbers & Pipefitters Local Union No 190 v Wolff*, 141 Mich App 815, 818; 369 NW2d 237 (1985).  MCL 600.1721 grants courts the power to order a party in contempt of court to indemnify the injured party for any "actual loss or injury" caused by the misconduct.  Therefore, the Court of Claims could properly assess attorney fees in this instance where the Department violated the court's orders to pay the refund and attorney fees.  Therefore, the Court of Claims did not abuse its discretion by awarding the attorney fees.

## IV.  INTEREST ACCRUAL FOR TEST VEHICLE REFUND CLAIM

Finally, the Department argues that Ford's January 28, 1999 letters were not claims or petitions for a refund that triggered the 45-day period before interest begins to accrue on a tax refund.  MCL 205.30 provides that interest begins to accrue on overpaid taxes 45 days after a

claim is made or a petition is filed. In *Ford Motor Co v Dep't of Treasury*, 496 Mich 382; 852 NW2d 786 (2014), our Supreme Court held the following regarding MCL 205.30:

> [W]hen the statute is read as a whole it is clear that, in order to trigger the 45-day waiting period before interest begins to accrue on a tax refund, a taxpayer must (1) have actually paid the tax at issue; (2) make a "petition . . . for" a refund or "claim for refund" by demanding, requesting, or asserting a right to a refund of tax payments that the taxpayer made to the Treasury return that the taxpayer asserts are not due; and (3) "file" the claim or petition by submitting it to the Treasury, thereby providing the Treasury with adequate notice of the taxpayer's claim for a refund. [*Ford Motor Co*, 496 Mich at 396.]

The Department first contends that there is no record evidence that Ford paid the taxes at issue as of January 28, 1999. The Department never challenged Ford's payment of the taxes below, so the record is devoid of documentary evidence on this issue. Thus, there are no factual findings on the record for us to review in relation to whether Ford paid the tax by 1999. The Court of Claims implicitly found that Ford paid the tax because it found that the interest began to accrue in 1999. In any event, the Department was able to verify and issue refund checks for the tax overpayment, which negates its contentions that it could not have had the money.

The Department argues that Ford's January 28, 1999 letters were not claims or petitions for a refund because they did not make an explicit demand for money and contemplated a future follow-up. A taxpayer can make a petition or claim for a refund by asserting a right to a refund for payments that the taxpayer asserts are not due. *Ford Motor Co*, 496 Mich at 396. Ford's first letter asserted a right to a refund for tax payments made to the Department, stating, "Any tax paid on these vehicles during the audit period was paid in error and *should be credited or refunded to Ford Motor Company*." (Emphasis added.) Ford's second letter also asserted a right to a refund, stating, "Therefore, Ford Motor Co. *should receive a refund* on tax paid on these vehicles for the open statutory period." (Emphasis added.)

The Department argues that Ford's claim was not "filed" because the letters stated that Ford intended to file a claim in the future. However, our Supreme Court has held that a claim is filed when it is submitted to the Department. *Ford Motor Co*, 496 Mich at 395. Filing requires the taxpayer to give the Department "adequate notice of the claim." *Id*. Both of Ford's letters were addressed and sent to the Department's audit supervisor; thus, the letters were submitted to the Department and gave notice of a claim for a refund. Because evidence supports that Ford paid the taxes at issue, petitioned or claimed a refund, and then filed the claim, the 45-day waiting period before interest began to accrue started after Ford sent its January 28, 1999 letters.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood