*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TRACY LEE MILLER,

        Plaintiff-Appellant/Cross-Appellee,

v

MARK ALAN MILLER,

        Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
April 25, 2024

No. 366614
Calhoun Circuit Court
LC No. 2021-003295-DM

Before: M. J. KELLY, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Plaintiff-appellant/cross-appellee, Tracy Miller, appeals by right the judgment of divorce and the orders modifying the judgment of divorce. Defendant-appellee/cross-appellant, Mark Miller, appeals by right the same judgment of divorce. Because we conclude that neither party has identified an error that warrants relief, we affirm.

## I. BASIC FACTS

The parties married in April 2001, and had two children: an adult son and a minor daughter, CM, who was 14 years of age at the commencement of the divorce. Tracy was 53 at the time of trial, and Mark was 54. Both parties were successful professionals. Mark managed a real estate business, and Tracy was an executive with a credit union.

The evidence from trial showed that the parties' relationship had soured over time. Tracy did not like that Mark had become friendly with the mother of one of CM's friends. After Mark failed to pull back from that relationship, Tracy sued for divorce. The trial court held a trial and heard extensive evidence about the parties' relationship issues and property. The court ultimately determined that both parties were good parents and awarded them joint legal and physical custody of CM. The court also divided their property equally, but it awarded the parties' lakefront property to Mark. The trial court entered its judgment in March 2023. In June 2023, the trial court clarified the judgment of divorce in an order denying Tracy's motion for relief from judgment.

-1-

## II.  EXCLUDED WITNESSES

## A.  STANDARD OF REVIEW

Tracy first argues that the trial court deprived her of a fair trial when it refused to allow her to call the witnesses on her amended witness list because it was untimely filed and refused to allow her to call witnesses from Mark's witness list.  This Court reviews a trial court's decision to preclude a party from calling a witness as a sanction for failing to comply with a scheduling order for an abuse of discretion.  *Duray Dev, LLC v Perrin*, 288 Mich App 143, 162; 792 NW2d 749 (2010).  A trial court abuses its discretion when it selects an outcome that falls outside the range of principled outcomes.  *Id.*

## B.  ANALYSIS

Trial courts may require parties to submit a witness list as a part of its scheduling order, MCR 2.401(I)(1), and they may prohibit a witness who was not properly listed from testifying, MCR 2.401(I)(2).  In determining whether to disallow witnesses from testifying as a sanction for failing to comply with the scheduling order, the trial court should consider the following nonexhaustive list of factors:

> (1) whether the violation was wilful or accidental, (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses), (3) the prejudice to the defendant, (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice, (5) whether there exists a history of plaintiff engaging in deliberate delay, (6) the degree of compliance by the plaintiff with other provisions of the court's order, (7) an attempt by the plaintiff to timely cure the defect, and (8) whether a lesser sanction would better serve the interests of justice. [*Dean v Tucker*, 182 Mich App 27, 32-33; 451 NW2d 571 (1990).]

On appeal, Tracy suggests that the trial court imposed a severe sanction by striking all of her witnesses, which prevented her from presenting her case.  She also complains that the trial court did not specifically address the *Dean* factors.  Her argument misstates the record.

Mark moved to preclude Tracy from calling any witnesses after she filed two successive untimely witness lists and Tracy moved for permission to allow her second untimely witness list.  After hearing the parties' arguments, the court elected not to bar Tracy from calling any witnesses.  The court agreed that there had been no surprises to the parties because they had been involved in a number of contentious disputes already and had participated in mediation.  The court felt that a one-day delay in filing the first witness list did not prejudice Mark, so it allowed that witness list in full.  The court also allowed an expert appraiser from Tracy's second witness list but decided against allowing the additional witnesses.  The court explained that Tracy filed the second witness list well beyond the deadline and increased the number of witnesses substantially.

The record demonstrates that the trial court was aware of the *Dean* factors, considered the parties' arguments, and crafted what it felt was an appropriate remedy.  Indeed, in its opinion after

Tracy moved for reconsideration, the court clarified that it had considered the factors without specifically going through them and elected not to impose the most severe sanction of precluding all Tracy's witnesses. Accordingly, Tracy's argument that the court failed to even consider the relevant factors was inapposite; the trial court clearly weighed the nature of the violation against Tracy's need to put on her case and considered everything in light of the fact that the case had proceeded for months and discovery had closed. That is all that was required under *Dean*.

The court's ultimate decision fell within the range of reasonable and principled outcomes. Although disallowing witnesses may be tantamount to dismissing a case, that is not always true. See *Duray Dev*, 288 Mich App at 164. Here, the court allowed the first tardy witness list and allowed all the documentary evidence that she submitted with that list, even though Tracy did not include copies of the documentary evidence. As a result, this case was not similar to the situation in *Dean* in which the trial court dismissed the case after precluding the plaintiff from being able to call an essential expert witness. See *Dean*, 182 Mich App at 31. Rather, Tracy had the ability to prove the majority of her case through the parties' testimony and the documentary evidence. The court could properly consider whether the party who violated the order could prove his or her position through other means when crafting its remedy. See *Duray Dev*, 288 Mich App at 165. In such a case, the sanction of preclusion might not be extreme. Regardless, the court did not limit Tracy to proving her case through the parties' testimony and documentary evidence alone—it allowed her first witness list, which included the parties' neighbor, in addition to both parties; allowed rebuttal witnesses; and allowed her expert appraiser from her second untimely witness list.

A trial court's findings and conclusions are sufficiently stated when it appears to this Court that the trial court was aware of the issues, applied the law correctly, and when appellate review would not be facilitated by requiring further explanation. *Ford Motor Co v Dep't of Treasury*, 313 Mich App 572, 589; 884 NW2d 587 (2015). Here, the trial court properly considered the relevant factors and tailored its decision to the circumstances of the case and fashioned a remedy that did not prevent Tracy from making her case. Thus, the trial court's decision did not amount to an abuse of discretion.

Tracy faults the trial court for not explicitly identifying each *Dean* factor and for failing to determine whether allowing any particular witness would have prejudiced Mark. However, she does not address whether or how the trial court's decision prejudiced her. She just asserts that the decision deprived her of a fair trial, without any analysis or support. Tracy ignores the fact that the court ultimately allowed her to call additional witnesses from her second witness list. For instance, the court allowed her to call Michael Bremer to testify about the value of the split-dollar life insurance plan and to call Amber Mallernee and Adam Ormstead to rebut testimony by Mark's witnesses. Tracy also could have called CM's counselor but chose not to do so.

As for the witnesses whom she did not call, Tracy has made no effort to establish that the witnesses were ready, willing, and able to testify favorably for her. She has also made no offer of proof to establish what their testimony would have been. Accordingly, this Court would be left to speculate about whether any witness's testimony would have had any effect on the outcome. Indeed, this Court has no way to determine whether the witnesses would have testified favorably or whether their testimony would have had any substantive value for the resolution of a material dispute. Consequently, even assuming that the trial court could have better crafted a remedy for

Tracy's failure to follow the scheduling order, Tracy has not demonstrated that any error warrants relief.

Tracy has also failed to demonstrate that the court abused its discretion when it refused to allow her to call witnesses who were listed on Mark's witness list. The trial court acknowledged that Tracy wrote on her witness lists that she reserved the right to call any witness listed on "plaintiff's" witness list, and it agreed that that was likely an error. The trial court noted that Mark had a long witness list and observed that the list involved potential witnesses whom Mark might not have intended to call. Given the situation, the court elected to hold Tracy to the strict terms of her witness list, which did not reserve the right to call witnesses appearing on Mark's witness list.

Tracy invites this Court to consider her witness list, apply the canons of construction to conclude that it was ambiguous, and rewrite her list to conform to her likely intent in drafting it rather than enforcing its as written. The witness list was not, however, ambiguous. See *Barton-Spencer v Farm Bureau Life Ins Co of Mich*, 500 Mich 32, 40; 892 NW2d 794 (2017) (stating that a provision is ambiguous when it is equally susceptible to different meanings). Tracy wrote that she reserved the right to call "All witnesses listed by Plaintiff," which was redundant, but not equally susceptible to multiple meanings. She may have intended to write "Defendant" in lieu of "Plaintiff," but her unilateral mistake did not render the list ambiguous, and the trial court had no obligation to rewrite the terms of her witness list. Notably, Tracy repeated the error in her second witness list, did not attempt to correct it at the hearing on her motion for permission to amend her witness list, and did not raise it in a motion before trial. Under the circumstances, the trial court did not abuse its discretion when it limited Tracy to the witnesses whom it had already determined would be allowed. Additionally, Tracy has again failed to make any effort to demonstrate that the trial court's decision prejudiced her trial. She has not identified the witnesses whom she would have called, has not made an offer of proof concerning their proposed testimony, and has not stated how the outcome would have been different had she been allowed to call the witnesses. Consequently, Tracy has not demonstrated that this error warrants relief.

## III. ESTABLISHED CUSTODIAL ENVIRONMENT

### A. STANDARD OF REVIEW

Tracy next argues that the trial court clearly erred when it found that CM had an established custodial environment with Mark and, for that reason, applied an incorrect burden. As this Court has explained, custody decisions involve three different standards of review:

> Three different standards govern appellate review of a trial court's decision in a child custody dispute. We review findings of fact to determine if they are against the great weight of the evidence, we review discretionary decisions for an abuse of discretion, and we review questions of law for clear error. A factual finding is against the great weight of the evidence if the evidence clearly preponderate[s] in the opposite direction such that the judgment is a miscarriage of justice. A clear legal error occurs when the circuit court incorrectly chooses, interprets, or applies the law . . . ." An abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or

bias.  [*Martin v Martin*, 331 Mich App 224, 235; 952 NW2d 530 (2020) (quotation marks and citations omitted).]

## B.  ANALYSIS

A trial court may not modify or amend a previous judgment or order, or issue a new order, so as to "change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child."  MCL 722.27(c).  Because the existence of an established custodial environment and whether a prosed custody arrangement alters the established custodial environment affects the burden, a trial court must first address the existence of an established custodial environment when resolving a custody dispute.  See *Marik v Marik*, 325 Mich App 353, 360-361; 925 NW2d 885 (2018).

The "custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort."  MCL 722.27(c).  The court should consider the "age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship" when determining whether and with whom a child has an established custodial environment.  MCL 722.27(c).  An established custodial environment is "both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence."  *Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008).

The trial court found that CM had an established custodial environment with both parents.  Tracy argues that the evidence showed that CM had an established custodial environment with her alone.  She contends that she alone really provided for CM's needs and that CM saw her father more as a boating buddy than a parent.  The record does not support her contention.

At trial, Mark presented evidence that he had provided for both CM's physical and psychological needs, and that she had traditionally looked to him for those needs.  Mark was an early riser and had consistently ensured that CM got ready for school, packed her lunch, and dropped her off at school.  He picked her up and set aside time to get her to her various activities and participated in medical decisions and appointments.  He also helped her with her homework.  Mark characterized himself as CM's primary caregiver for most of her life and stated that he was the parent who was always available.  Mark was also very active in CM's sporting life—he coached teams, taught her to play tennis, taught her to boat and jet ski, and spent time with her on numerous trips to tournaments.

Tracy argues that the above evidence merely showed that Mark was a "buddy" to CM, but that it did not show that CM sought meaningful guidance and support from him.  In contrast, Mark testified that CM did in fact seek guidance from him and had a good bond with him.  Additionally, there were several witnesses who observed Mark's relationship with CM over a span of years, and they each confirmed that CM had a healthy custodial relationship with Mark that included a loving bond, discipline, and guidance.

Tracy further points to the evidence that CM recently started resisting parenting exchanges as evidence that Mark's behaviors had destroyed whatever established custodial environment that CM might have had with him. The evidence concerning that development supported inferences that either or both parties were responsible for CM's resistance to parenting exchanges. Mark engaged in childish behavior at a volleyball tournament that embarrassed CM and persisted with a friendship at a time when it might have been better to row back for CM's sake, but there was also evidence that Tracy exaggerated the importance of that incident and exaggerated the depth of Mark's friendship with the mother of CM's friend. Tracy also compelled CM to testify against her father in order to gain a marginal advantage in the custody dispute. There was also evidence that she only half-heartedly encouraged CM to participate in parenting exchanges. Moreover, Tracy wanted to relegate Mark to a weekend parent despite the strong evidence that he had been an active participant in CM's life. The evidence suggested that Tracy was not as dedicated to fostering CM's continued relationship with her father as she professed. It was for the trial court to resolve the disputed inferences to be drawn from the evidence, and it found that CM maintained her established custodial environment with both parents, notwithstanding the strains arising from the divorce. See *Berger*, 277 Mich App at 715. Because there was evidence to support that finding, it was not contrary to the great weight of the evidence. See *Martin*, 331 Mich App at 235. Consequently, because Tracy's requested custody change would plainly alter CM's established custodial environment with her father, the trial court did not misapply the law when it determined that it could not change the custody arrangement so as to alter the established custodial environment unless it first found that the change was supported by clear and convincing evidence. See *id*.

## IV. SPOUSAL SUPPORT

### A. STANDARD OF REVIEW

Tracy next argues that the trial court abused its discretion when it ordered her to pay spousal support. This Court reviews a trial court's decision to award spousal support for an abuse of discretion. See *Loutts v Loutts*, 298 Mich App 21, 25; 826 NW2d 152 (2012). This Court reviews for clear error the findings underlying the trial court's decision on spousal support. *Id*. at 26. A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court was mistaken. *Id*.

### B. ANALYSIS

Trial courts have discretion to order one spouse to pay spousal support to the other when "the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party." MCL 552.23(1). The purpose of an award of spousal support is to "balance the incomes and needs of the parties so that neither will be impoverished." *Loutts*, 298 Mich App at 26. When determining whether to order spousal support, the trial court must use a case-by-case approach that examines all the facts and circumstances surrounding the case. *Id*. at 29-31.

The court should consider the following factors:

(1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Id*. at 31-32 (quotation marks and citations omitted).]

The court should make specific findings for each of the factors that are relevant to the particular case. *Id*. at 32.

When addressing this issue, the trial court mentioned that an award of spousal support was governed by MCL 552.23 and recognized that it had to consider the factors identified under caselaw when determining whether an award was appropriate. The trial court addressed fault, and it reminded the parties that it did not prescribe much to this factor. It explained that Tracy placed a great deal of emphasis on the allegedly inappropriate relationship between Mark and the mother of CM's friend but that there was evidence that the parties' relationship had been strained for years. The court indicated that the parties had been able to get along despite the "challenging relationship" until the recent strain caused by the relationship. The court also noted the evidence that others did not see Mark's relationships as inappropriate and that Mark denied that he had had an inappropriate relationship with any woman. The court recognized that Tracy had herself testified that the marriage had not been good for some time. Given the evidence, the court essentially found that neither party was more at fault for the breakdown of the marriage. Tracy tries to reframe the issue as one involving whether the trial court improperly focused on whether there was adultery rather than whether Mark had an inappropriate relationship. The trial court, however, was focused on whether the allegedly inappropriate relationship was in fact the cause of the marital breakdown, and it found that it was not. The trial court's finding was fully supported by the record.

There was also evidence that the parties' relationship had become strained long before the events at issue and that the parties were akin to roommates rather than husband and wife. Mark testified that the breakdown in the relationship went much deeper than recent events. He stated that Tracy was not emotionally connected to him and that the parties had had a breakdown in communication. There was also no romantic connection anymore. He stated that they were just roommates who did what they needed to preserve their careers and to help the children. Tracy also recognized that the marriage had broken down years earlier; she stated that they had had a breakdown in communication five to seven years before the divorce. She said that Mark had begun to live as though he were a bachelor long before her decision to sue for divorce. A close friend of the family also noted that the parties' relationship had appeared "transactional" for years, and another friend noted that the parties had been a lighthearted couple when they first met but that they had a lot of tension over the past few years and that they appeared to be getting along for the children's benefit.

Tracy was angered by the apparent emotional bond that Mark had developed with the mother of CM's friend, but the evidence showed that that development was not the cause of the marital breakdown—it was a symptom of a breakdown that had occurred years earlier. The trial court's finding that fault was not really at issue in the decision to award spousal support was not clearly erroneous. See *Loutts*, 298 Mich App at 26.

Tracy also faults the trial court for not specifically addressing Mark's financial needs. The court, however, did go over Mark's proposed budget and indicated that it accepted his budget with some modifications. The trial court did not need to make elaborate findings that addressed every aspect of the proposed budget; it only needed to make brief, definite findings on the relevant factors. See MCR 2.517(A)(2). The court's statement that it accepted Mark's budget with some modifications for items that were not appropriately considered a personal expense was sufficient to facilitate appellate review. See *Ford Motor Co*, 313 Mich App at 589.

Tracy also challenges the trial court's finding that Mark made substantially less than her. The trial court found that Mark earned $138,000 a year and that Tracy earned $376,000. The record supports that finding. Mark testified that he earned $232,568 in 2021, which was his total income before deductions for expenses that he had to promote his business. He testified, however, that that amount was "abnormal." Mark admitted his W-2 forms and Schedule C expenses for 2019 through 2021 to establish his ordinary annual income from wages and commissions and his ordinary business expenses over that three-year period. Accordingly, the trial court had evidence before it from which it could find that Mark's ordinary annual income after expenses was substantially lower than the gross income for an abnormally high year. We are not be left with the definite and firm conviction that the trial court's finding was erroneous. See *Loutts*, 298 Mich App at 26.

Tracy also argues that the trial court abused its discretion when it ordered spousal support because, even accepting Mark's income at $138,000 a year, he had more than enough income to cover his budget. She also suggests that the trial court did not consider her financial needs after it essentially left her homeless. Yet, the evidence showed that the parties' joint incomes allowed the family to enjoy a lifestyle that Tracy herself characterized as blessed. The family enjoyed a lake life, which included expensive boats and watercraft. They traveled frequently, often ate at restaurants, enjoyed a country club membership, and were able to cover numerous expenses for their children, which included providing their adult son with a significant allowance while in college. Although Mark earned an income that would be more than adequate for some families, his income was less than half of Tracy's income and represented a fraction of the wealth previously available to the family. Mark testified that his income alone would not be adequate to provide the lifestyle to which he and his family had been accustomed.

There was evidence that Tracy handled the loans, which were a significant portion of the family's monthly expense. Even though Mark paid the ordinary bills from his joint account, Tracy had to replenish that account with deposits from her accounts on a fairly regular basis. Accordingly, there was evidence that Mark would not be able to maintain the same lifestyle without the extra income that Tracy had previously brought to the marriage. A trial court may properly make an award of spousal support when a parties' assets are insufficient for them both to maintain the lifestyles to which the parties had been accustomed. See *Reeves v Reeves*, 226 Mich

App 490, 494; 575 NW2d 1 (1997). Therefore, the fact that Mark might have sufficient funds to meet his monthly budget did not preclude an equitable award of spousal support.

Tracy also asserts that the trial court's award was inequitable because the court did not consider her budget and her needs. Tracy makes much of the fact that Mark would have $11,500 a month available to him to pay his expenses, but she does not mention that she would have more than $30,000 a month available to her. If Mark had enough to maintain his lifestyle at $11,500 a month, then Tracy plainly had enough to meet her needs at approximately three times his income.

Tracy also asserts that—because the trial court awarded the marital home to Mark—she was essentially homeless and had to incur the expenses associated with establishing a new home. Tracy, however, had access to a second home, which was held by her deceased brother's trust. Although she testified that she would not feel comfortable living there, she nevertheless could do so if she chose to. Further, if she elected to finally distribute her brother's estate, she would be able to sell the home to generate additional money with which to purchase or rent a new home. Tracy also will not have the expense of maintaining the marital home, which freed up a portion of her monthly income to rent or purchase a new home.

Additionally, the amount of support actually awarded by the trial court—$1,000 a month for five years—was modest when compared to the parties' incomes. An increase of $1,000 a month provided Mark with less than a 10% increase in his monthly income and reduced Tracy's monthly income by approximately 3%. The shift in income occasioned by the support order cannot be said to have impoverished Tracy. See *Loutts*, 298 Mich App at 26.

Tracy complains that the trial court did not consider the fact that she had a child support obligation of $711 a month, which increased Mark's total available income to support his lifestyle with CM. The child support obligation was for CM's benefit—not Mark's benefit. See *LME v ARS*, 261 Mich App 273, 288; 680 NW2d 902 (2004). For that reason, the trial court did not err when it failed to add that amount to Mark's monthly income when determining whether Mark would have sufficient income to maintain his lifestyle.

In sum, Tracy has not shown that the trial court abused its discretion when it awarded $1,000 a month for five years in spousal support to Mark.

## V. PROPERTY VALUATION

## A. STANDARD OF REVIEW

Tracy next argues that the trial court erred when it valued the marital home and erred when it valued a warehouse that the parties' owned. This Court reviews a trial court's findings underlying its property division for clear error. *Berger*, 277 Mich App at 717.

## B. MARITAL HOME

At trial, the parties presented evidence that their neighbor sold them their marital home and held an option to repurchase it in the event of a transfer.[1] The trial court summarized the testimony about the neighbor's option and the price that would be required for him to exercise the option. It found that that price was $621,882. The trial court did not find that the neighbor would exercise the option, but acknowledged that he testified that he might exercise his option without regard to whom the home was awarded. The court acknowledged Tracy's testimony that the home was worth between $700,000 and $725,000, and it stated that Mark opined that the house might be worth $650,000. Nevertheless, the court felt that the option price was the proper valuation to give the home as between the parties.

The parties did not present any expert testimony about the value of the home. Instead, they relied on their own opinions to establish the value. Although Tracy testified that the house was worth from $700,000 to $725,000, she stated that would be her list price. As such, it was essentially aspirational. She also premised that valuation on an appraisal, and there was evidence that that appraisal did not discount the price for the deed restrictions and existing option. From that evidence, the trial court could find that Tracy's proposed value lacked credibility.

Mark opined that the home might have a value of from $625,000 to $650,000, but that value also did not consider the deed restrictions and option. The trial court could have found that assessment more credible given Mark's work as a real estate agent. In the end, however, the trial court chose not to speculate about the value on the basis of the parties' testimony. Instead, it valued the home on the basis of the more concrete evidence involving the option price. This Court must defer to the trial court's superior ability to judge the credibility of the evidence and assign weight on the basis of those determinations. See *id.* at 715. Given the paucity of credible evidence concerning the fair market value of the home, we are not left with the definite and firm conviction that the court was mistaken when it set the value at $621,882. See *id.* at 717.

## C. WAREHOUSE

Tracy's expert appraiser testified that the warehouse was worth $100,000; however, he agreed that he did not make any adjustments for the fact that the property did not have utilities. Rather, he opined that such an adjustment was not appropriate given that the property was valued for its use as a storage facility.

Mark testified that the expert's appraisal should be discounted from $100,000. He explained that the appraiser compared the property to properties that, unlike the parties' warehouse, had utilities. Mark stated that he had had an estimate to add electricity prepared in the past and learned that it would cost $15,000. He felt that the appraiser should also have considered

---

[1] On appeal, Tracy argues at length about whether the neighbor's option would be triggered by a transfer in divorce, about whether the option was still valid, about the terms of the option, and about other matters that were not litigated in the trial court. Because these matters are irrelevant to determining whether the trial court's valuation was clearly erroneous, we decline Tracy's invitation to address them.

the changing character of the surrounding properties: there was a school across the street and residential housing all around. Given all these factors, he opined that the property was worth $80,000.

The trial court clearly assessed the weight and credibility of all the testimony and determined that Tracy's expert overstated the value of the warehouse and Mark understated its value. The court's value was below the average of the values selected by the expert, but higher than the lower of the value that the expert derived using the income-based approach to valuation. The trial court's value was also halfway between the values given by the expert and Mark. We defer to the trial court's assessment of the weight and credibility to afford the evidence and conclude that the trial court did not clearly err. See *id*. at 715, 717.

## VI. RETIREMENT ACCOUNT

### A. PRESERVATION

On cross-appeal, Mark argues that the trial court clearly erred when it valued the marital portion of Tracy's retirement account by applying a coverture factor. Tracy argues that Mark failed to preserve this claim of error or otherwise abandoned it on appeal. We disagree. In civil cases, Michigan follows "the 'raise or waive' rule of appellate review." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Under that rule, to preserve an issue for appellate review, the party asserting error must demonstrate that the issue was raised in the trial court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Moreover, the party asserting error must show that the same basis for the error claimed on appeal was brought to the trial court's attention. *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636, 642; 534 NW2d 217 (1995).

Here, after the trial court elected to enter Mark's proposed judgment, however, the parties filed motions challenging the division of the retirement accounts. During a hearing on the motions, the trial court specifically addressed the argument that it was improper for it to apply a coverture factor to value the divisible portion of the retirement accounts. The parties then argued whether the coverture factor should include the 80 months that Tracy spent working at a different credit union because she rolled the retirement funds from that period into the retirement fund from her current employer. Following oral argument, the trial court elected to stay with its original decision to value all the retirement accounts using a coverture factor. Thus, the issue has been preserved for appellate review and has not been waived.

### B. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly applied the law to the facts. *Redmond v Heller*, 332 Mich App 415, 438; 957 NW2d 357 (2020). This Court reviews a trial court's findings underlying its property division for clear error. *Berger*, 277 Mich App at 717.

### C. ANALYSIS

On appeal, Mark argues that the trial court should have applied this Court's decision in *McNamara v Horner*, 249 Mich App 177; 642 NW2d 385 (2002), rather than use a coverture factor

because the retirement fund at issue involved continued contributions rather than a defined-benefit plan. In *McNamara*, this Court analyzed whether the trial court erred when it divided the parties' retirement funds and tax-deferred annuities equally when there was evidence that both types of accounts had been funded with premarital funds. *Id.* at 181. There was evidence that the parties comingled the accounts with marital assets and that the change in value was not wholly passive as a result. *Id.* at 181-182. This Court concluded that the trial court did not err when it determined that these accounts were all marital assets. It explained that, although the accounts were started before the parties' marriage and had included premarital funds, the funds increased as a result of marital contributions. Because it was no longer possible to determine the appreciation attributable to the premarital portion, this Court held that the trial court did not err when it determined that the entire appreciation of the funds was part of the marital estate. *Id.* Notably, the *McNamara* Court did not hold that a trial court must always value a defined-contribution plan by subtracting the amount demonstrated to be premarital and then dividing the remainder in half. It simply held that the trial court did not err by doing so. *Id.*

Indeed, other valuation methods may also be used. See *Heike v Heike*, 198 Mich App 289, 292; 497 NW2d 220 (1993) ("We therefore hold that no one valuation method is *required*; rather, the trial court, when valuing a pension, is obligated to reach a fair and equitable division of the property in light of all the circumstances."). For instance, it is permissible to apply a coverture factor to the valuation of a pension when a portion of the pension was earned before marriage and a portion was earned during marriage. *Vander Veen v Vander Veen*, 229 Mich App 108, 110-111; 580 NW2d 924 (1998).

Here, the trial court found that Tracy had begun her retirement fund before the parties were married. The court found that that portion of the fund that accumulated during the marriage should be divided equally; the court provided that the judgment should apply a coverture fraction to separate out that portion of the retirement fund that belonged to Tracy as her separate property. The trial court applied the coverture fraction to Mark's accounts too. The trial court elected to continue the application of the fraction for valuation after Mark objected that that resulted in an inequitable division of Tracy's retirement account.

Doing so was not clear error. The parties did not offer any expert testimony about the retirement accounts and whether the increase attributable to either parties' premarital defined contribution plans could be separately calculated. Although the trial court could have relied on *McNamara* to treat the accounts as thoroughly commingled and, therefore, marital property, it decided to apply a coverture factor to each plan for purposes of valuation to derive what it felt would be an equitable distribution of the marital portion of the retirement accounts. On this record, we are not left with the definite and firm conviction that it was mistaken when it valued the marital portions in this way. See *Berger*, 277 Mich App at 717.

Affirmed. Neither party having prevailed in full, no costs may be taxed. See MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Christopher M. Murray

-12-