*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NAVEEN F. SANGJI,

      Plaintiff-Appellee/Cross-Appellant,

UNPUBLISHED
January 11, 2024

v

PAVAN K. BENDAPUDI,

      Defendant-Appellant/Cross-Appellee.

No. 361509
Washtenaw Circuit Court
Family Division
LC No. 20-000295-DM

Before: HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

Defendant-appellant/cross-appellee, Dr. Pavan K. Bendapudi, appeals by right the trial court's judgment of divorce and its orders governing parenting time and child support. He argues that the trial court improperly restricted his right to travel with his son, DKB, during regular parenting time, erred when it included plaintiff's childcare costs in the child support order, and abused its discretion when it completely failed to address his request for an award of attorney fees premised on plaintiff's misconduct during the litigation. On cross-appeal, plaintiff-appellee/cross-appellant, Dr. Naveen F. Sangji, also appeals the trial court's judgment of divorce. She argues that the trial court's findings underlying its best-interest determination were contrary to the great weight of the evidence and did not support a parenting-time award that required DKB to travel to Boston so frequently. She also claims that the trial court erred when it delegated its authority to resolve parenting-time and custody disputes to the child's guardian ad litem (GAL), abused its discretion when it precluded her experts from testifying about the specifics of her case, erred when it determined that an investment account was defendant's sole property, and erred when it refused to order retroactive child support. For the reasons explained in this opinion, we conclude that the parties have not identified any errors that warrant relief. Accordingly, we affirm.

## I. BASIC FACTS

The evidence showed that the parties met in February 2015. Defendant had already completed his medical training and was an established physician-researcher working at two hospitals in Boston by the time plaintiff completed her fellowship. The parties married in July 2018.

Because plaintiff had not yet obtained a position as a physician-researcher, the parties agreed that plaintiff should conduct a national job search. Eventually, plaintiff obtained an offer from the University of Michigan, which she accepted in January 2019. Defendant also applied for a position with the university and received an offer. There was evidence that defendant did not believe that the university's offer was adequate in light of his established lab and practice in Boston. The parties argued frequently about whether defendant should accept the offer. Defendant claimed that plaintiff essentially sabotaged his negotiations with the university by accepting the university's offer to her before he had completed his negotiations; plaintiff took the position that defendant was being unreasonable and should have accepted the offer for the sake of his family.

Plaintiff relocated to Ann Arbor, Michigan, in September 2019. She was eight months pregnant, and she gave birth to DKB later that month. Defendant came to Ann Arbor for a few weeks to be with plaintiff and DKB after DKB's birth. There was evidence that the parties' relationship had become strained by the move to Ann Arbor and the dispute over whether defendant should accept the offer from the university.

Defendant turned down the university's offer in January 2020. The parties disputed the nature of their agreement on how to proceed after defendant refused the offer. Defendant stated that plaintiff agreed to return to Boston after working in Ann Arbor for a year. Plaintiff asserted that defendant agreed to relocate to Ann Arbor after working for another year in Boston. Plaintiff sued for a divorce in February 2020.

Plaintiff alleged that defendant had emotionally and verbally abused her during the marriage and that his behavior had worsened over time. Defendant denied the allegations and claimed that plaintiff was using the allegations to prevent him from having a relationship with DKB. Thereafter, the parties engaged in contentious battles over every aspect of the divorce proceedings. The trial court eventually held a trial over 19 days spanning several months. The trial court entered a judgment of divorce in May 2022. Both parties then appealed in this Court.

## II. DEFENDANT'S APPEAL

### A. PARENTING-TIME RESTRICTIONS

#### 1. PRESERVATION

On appeal, defendant challenges the trial court's decision to impose restrictions on his ability to travel with DKB during defendant's parenting time. Specifically, defendant argues that the trial court had no authority to impose restrictions on travel, that such restrictions were unconstitutional, and that the record did not support the imposition of restrictions.

Defendant adequately raised a challenge to the trial court's decision to impose travel restrictions based on the facts before it when he argued at trial and in a motion for clarification that he should be allowed to travel with DKB during his parenting time. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). But defendant did not at any point argue that the trial court lacked the statutory authority to limit the geographic area within which he could exercise his parenting time. He also did not argue that any such restrictions would amount to a violation of his fundamental liberty interest in DKB's care and custody, nor did he contend that the trial court's limitations on his parenting time equated to a violation of the right to equal

protection under the law. Therefore, his statutory and constitutional claims of error were not preserved for appellate review. See *id*.

In a civil case, a party waives a claim of error that the party did not properly preserve by bringing the issue to the trial court's attention. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 2-3. Although we have the discretion to consider issues that were not properly preserved in the trial court, this Court will exercise its discretion only when exceptional circumstances warrant review. See *Bailey v Schaaf (On Remand)*, 304 Mich App 324, 345-346; 852 NW2d 180 (2014), vacated in part on other grounds at 497 Mich 927 (2014). On the record before this Court, we conclude that this case does not involve the kind of exceptional circumstances that would justify reviewing these claims of error for the first time on appeal. Accordingly, we decline to exercise our discretion to review defendant's claims that the trial court lacked the authority to impose travel restrictions and that any travel restrictions were unconstitutional.

## 2. STANDARD OF REVIEW

The Legislature provided trial courts with the equitable power to resolve custody disputes—which include parenting-time disputes—under the Child Custody Act, MCL 722.21 *et seq*. MCL 722.24(1); MCL 722.26(1). The Legislature further provided that appellate review of a trial court's resolution of custody disputes should be limited: "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. A finding of fact is against the great weight of the evidence when the evidence clearly preponderates in the opposite direction. *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019). This Court reviews a trial court's custody decision for an abuse of discretion. *Shulick v Richards*, 273 Mich App 320, 323; 729 NW2d 533 (2006). This Court will conclude that a trial court abused its discretion in a custody dispute only when the trial court's exercise of discretion is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. *Geering v King*, 320 Mich App 182, 188; 906 NW2d 214 (2017). A trial court commits a clear legal error when it incorrectly chooses, interprets, or applies the law. *Dailey v Kloenhamer*, 291 Mich App 660, 665; 811 NW2d 501 (2011). This Court reviews de novo the proper interpretation of law. See *Martin v Martin*, 331 Mich App 224, 244; 952 NW2d 530 (2020).

## 3. ANALYSIS

The Legislature authorized trial courts to impose reasonable restrictions on a parent's exercise of parenting time when the restrictions are in the children's best interests:

> The Legislature authorized trial courts in custody disputes to provide for reasonable parenting time "for the best interests of the child . . . ." MCL 722.27(1); see also MCL 722.27a(1) ("Parenting time shall be granted in accordance with the best interests of the child."). The court may provide for parenting time through "general or specific terms" and may subject the parenting time to "conditions" when it is in the child's best interests. MCL 722.27(1)(b); see also MCL 722.27a(8) (stating that a parenting-time order may contain any reasonable terms or conditions

that facilitate the orderly and meaningful exercise of parenting time).
Consequently, the trial court had the authority to order [father] to attend AA
meetings and participate in counseling as conditions on his exercise of parenting
time, if the court determined that those restrictions were in the children's best
interests. [*Kaeb v Kaeb*, 309 Mich App 556, 569; 873 NW2d 319 (2015).]

This Court must uphold the trial court's exercise of discretion in crafting a parenting-time schedule and subjecting the parties to reasonable restrictions unless this Court determines that the trial court abused its discretion. See *Diez v Davey*, 307 Mich App 366, 389; 861 NW2d 323 (2014).

In this case, the parties vigorously disputed whether it was in DKB's best interests to travel long distances at his young age. Specifically, plaintiff argued that it was in DKB's best interests to have defendant exercise his parenting time in Ann Arbor alone. She maintained that the evidence demonstrated that DKB should only gradually be introduced to parenting time involving long-distance travel. Plaintiff presented evidence at trial that supported her position.

Plaintiff's expert in child custody and parenting time, Dr. Jack Phillip Haynes, testified that parenting exchanges were generally stressful for children but that a child's flexibility involving exchanges increased with maturity. Younger children, he related, were simply not as resilient to stress, so the number of exchanges should be lower. He also informed the trial court that parenting-time decisions should consider the amount of travel time and the mode of travel involved because long-distance travel can be stressful for a child, especially a younger child. According to Dr. Haynes, the court should consider the child's "age and [the] relationship of the child with the parents relative to travel time [and] travel distance." Dr. Haynes stated that there were many intangible factors that had to be considered when crafting a parenting-time order for parents who were separated by long distances, so he could not state whether there was a typical progression for long-distance travel as a child matured. Generally speaking, he explained, less travel time was less stressful for a child. Because very young children have fewer coping skills, Dr. Haynes opined that, whenever possible, the burden and stress of travel should be imposed on the parent, not the child.

The GAL assigned to DKB, Elizabeth Janovic, also testified that the parenting guidelines recognized that long-distance travel for parenting time can be burdensome on a child. She further agreed that this was true as a general proposition and acknowledged that whether a child could handle long-distance travel was fact specific.

When crafting its parenting-time order, the trial court took into consideration the evidence that parenting exchanges and long-distance travel might have an adverse effect on DKB. Indeed, it recognized that all five experts on children who testified at trial emphasized that it was important for DKB to have a relationship with both parents despite the distance between the parents' homes. The trial court explained that it wanted to design a parenting-time plan that would allow DKB to have a meaningful and secure relationship with both parents, even though his parents lived in different states. It stated that its parenting-time plan was intended to meet DKB's best interests by providing for frequent contact while taking into consideration his age and limiting the burden of travel on him.

The trial court also stated that because DKB had lived his whole life in Ann Arbor, there would necessarily be some adjustments that he would have to endure with any significant parenting time in Massachusetts. The court related that the issues caused by those adjustments had to be balanced against the need to develop healthy attachments with both parents. The trial court also explicitly recognized that a parenting-time schedule that was appropriate for a toddler might not be sustainable for a child who was school-aged. Nevertheless, the court rejected plaintiff's contention that DKB could not yet handle regular long-distance travel.

With these considerations in mind, the trial court fashioned a parenting-time order that compelled defendant to exercise his parenting time in Ann Arbor on some occasions and allowed him to exercise his parenting time in Boston on other occasions. After defendant asked for clarification as to whether he could travel with DKB upon effecting a parenting-time exchange, the trial court limited his right to travel during regular parenting time. The court limited defendant to travel within the state of Michigan during his parenting time in Ann Arbor and limited his travel with DKB in Boston to the greater Boston area. The trial court did not limit defendant's ability to travel with DKB during vacation parenting time. The court also stated on the record that the parties could always use their common sense and mutually agree to travel plans on a case-by-case basis.

The evidence supported the trial court's decision to include reasonable travel restrictions on defendant's parenting time. The trial court had to fashion a parenting-time schedule and order that provided defendant with meaningful parenting time at his home in Boston without unduly increasing the stress that DKB experienced. Because DKB had not yet engaged in long-distance travel on a regular basis, it was unclear how he might respond to the stress of regular long-distance travel and of having a third residence. It was, for that reason, reasonable for the trial court to limit defendant's exercise of parenting time in ways that would limit the strain on DKB, especially during the initial implementation of the parenting-time plan.

To that end, the trial court carefully crafted a parenting-time schedule that limited the number of times that DKB would have to travel long distances for purposes of parenting time. The protection afforded by that limitation would be meaningless if defendant could circumvent it by taking physical custody of DKB in Ann Arbor and then traveling with him to Boston anyway. Accordingly, it was reasonable for the trial court to limit defendant's parenting time in Ann Arbor to include only travel in Michigan.

It was also reasonable for the trial court to limit defendant's travel in the Boston area during periods when he exercised his parenting time in Boston. DKB was still quite young, and the strain of parenting-time exchanges from Ann Arbor to Boston, and then back again, could be significant. The trial court had to balance the strain of those exchanges with the benefit of allowing DKB to experience parenting time with defendant in defendant's home in Boston. It was not a stretch for the trial court to infer that DKB would not be well served by enduring the strain of additional travel over long distances after traveling to Boston and before returning to Ann Arbor. The court could properly determine that—given DKB's young age—defendant should limit his travel during regular parenting time in Boston. In that way, defendant could concentrate on developing DKB's familiarity with his Boston home rather than engaging in additional long-distance travel within the short span of time allocated for regular parenting time in Boston.

The trial court also provided the parties with flexibility on the travel restrictions; they could mutually agree to allow additional travel on a case-by-case basis. Although defendant correctly notes that DKB might already have, or might develop, the resilience to allow for greater freedom of travel, the record does not yet support that assertion. Moreover, the parties may properly move to modify the restrictions on travel on the basis of evidence developed from experience with the trial court's parenting-time order or even through ordinary life changes that permit an inference that DKB can handle the burden of increased long-distance travel. As this Court has stated, even ordinary changes in the circumstances surrounding parenting time might justify revisiting a parenting-time restriction:

> A condition that was in the child's best interests when the child was in elementary school might not be in the child's best interests after he or she reaches high school. Even ordinary changes in the parties' behavior, status, or living conditions might justify a trial court in finding that a previously imposed condition is no longer in the child's best interests. We conclude that "proper cause" should be construed according to its ordinary understanding when applied to a request to change a condition on parenting time; that is, a party establishes proper cause to revisit the condition if he or she demonstrates that there is an appropriate ground for taking legal action. [*Kaeb*, 309 Mich App at 571 (citation omitted).]

The evidence established that parenting exchanges in general were stressful for young children and that exchanges involving long-distance travel could be additionally burdensome. The trial court found that limiting defendant's ability to travel with DKB while exercising his regular parenting time would be in DKB's best interests because it would ensure that both parents had meaningful parenting time while limiting the burden of the parenting exchanges and the associated travel on DKB. The record supported the trial court's findings and the particular restrictions.

Defendant complains that the trial court's restriction compelling him to exercise his "Ann Arbor" parenting time within the state of Michigan did not make sense because a short trip to Toledo, Ohio, would be precluded whereas a longer and more burdensome trip to northern Michigan would not be prohibited. Notably, when defendant exercises his parenting time in Michigan, he travels to DKB, so DKB begins his parenting time without having had to travel a long distance. Moreover, in those cases, DKB will not have to endure another long trip to return to plaintiff's care. That difference alone warrants treating parenting time in Michigan differently than parenting time in Boston. Additionally, the fact that the trial court might have crafted a parenting-time restriction that better suited the geographic position of Ann Arbor—such as a 100-mile rule or restricting travel to a specific amount of time—does not require the conclusion that the trial court's decision was so palpably and grossly violative of fact and logic that it evidenced a perversity of will, a defiance of judgment, or the exercise of passion or bias. See *Geering*, 320 Mich App at 188. Rather, it is evident that the trial court's primary concern was that, absent a restriction on parenting time in Ann Arbor, defendant might circumvent the entire parenting-time scheme by simply taking DKB back to Boston. The limitation on travel out of Michigan alleviated that concern.

Defendant's complaints about the trial court's decision not to impose travel restrictions on plaintiff are also inapposite. Although the trial court stated that there was no need to restrict

plaintiff's travel because she only had one "free weekend" each month, it is evident from the entire discussion on the record that the trial court felt that the existing parenting-time schedule made it unlikely that plaintiff would be able to engage in extensive long-distance travel with DKB during her regular parenting time. The record supports that conclusion. DKB would soon be of preschool age and would have regular weekday obligations and activities that would not allow regular long-distance travel. The parenting-time schedule made it unlikely that plaintiff would be able to take DKB on long-distance trips outside of her settled vacation times. Accordingly, the trial court could reasonably conclude that it was unnecessary to restrict her travel with DKB during regular parenting time.

The trial court's travel restrictions as a whole were reasonably calculated to serve DKB's best interests by limiting the burden of travel on him while having the opportunity to form a meaningful relationship with defendant at his Boston home. The trial court crafted the restrictions so as to allow defendant to engage in long-distance travel during vacation parenting time and to allow less lengthy travel during regular parenting time. The court also recognized that the parties could always mutually agree to modify the restrictions. Examined as a whole, the trial court's restrictions were reasonable, circumscribed, and clearly intended to serve DKB's best interests. Consequently, the trial court did not abuse its discretion when it included those restrictions as a condition on defendant's exercise of parenting time.

## B. CHILDCARE EXPENSES

### 1. STANDARD OF REVIEW

We next address defendant's claim that the trial court improperly allocated plaintiff's childcare expenses under the Michigan Child Support Formula (MCSF). This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and provisions of the MCSF. *Borowsky v Borowsky*, 273 Mich App 666, 672; 733 NW2d 71 (2007). To the extent that a trial court has discretion under the MCSF, this Court reviews the trial court's exercise of discretion for abuse. *Id*. A trial court abuses its discretion under the formula when its decision falls outside the range of reasonable and principled outcomes. *Id*. Finally, this Court reviews for clear error the trial court's factual findings underlying its application of the law. *Id*. A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court made a mistake. *Stallworth v Stallworth*, 275 Mich App 282, 284; 738 NW2d 264 (2007).

### 2. ANALYSIS

The trial court had an obligation to calculate child support in accordance with the then-current formula unless application of the formula would be unjust or inappropriate. See MCL 552.605(2). Under the MCSF, a trial court has to "allocate the actual child care expenses for the children in the case under consideration" if the childcare costs "allow a parent or nonparent-custodian to look for employment, retain employment, or to attend an educational program to improve employment opportunities." 2021 MCSF 3.06(A); see also 2021 MCSF 3.01(A) (defining the support obligation to include a base support obligation, a medical support obligation, and childcare expense obligations). When a parent has an "established child care pattern and can verify that they have actual, predictable and reasonable child care expenses," the trial court must "use the actual costs in the calculation." 2021 MCSF 3.06(A)(1). The court was required to assume that

the parties would follow the custody and parenting-time orders when calculating the childcare obligations. 2021 MCSF 3.06(A)(3). Notwithstanding that presumption, "if a child care provider requires payment to retain a slot for a child without regard to whether the child actually attends," that additional cost is to be included. *Id.*

The record demonstrated that both parents had unique and highly demanding professional careers in medicine. Both parents had clinical obligations in their respective hospitals in addition to research and administrative obligations. As a burn surgeon, plaintiff was on-call during specified periods within which she might be called upon to respond to an emergency. The unique nature of her employment as both a specialized surgeon and a researcher permitted an inference that she would require childcare for DKB to cover those times when she had to meet her clinical, research, and administrative obligations, and permitted an inference that the need for childcare might arise at unpredictable moments.

In addition to these unpredictable moments of need, the evidence supported a finding that in-home childcare allowed plaintiff to meet her employment obligations that she could perform at home without impairing her ability to parent DKB throughout the day. The trial court could conclude from the totality of the evidence that plaintiff's in-home childcare provided predictability and continuity that made it possible for her to meet her demanding employment obligations. Moreover, the same evidence permitted an inference that employing a dedicated in-home caregiver for a fixed minimum number of hours a week without regard to whether DKB was in plaintiff's care was essential to retention of a childcare provider who could meet plaintiff's peculiar childcare needs.

In discussing this issue on defendant's motion for reconsideration, the trial court impliedly found that plaintiff's evidence established that she incurred actual childcare expenses, which were reasonably related to retaining her employment:

> The Court determined that Plaintiff is a full-time surgeon who works and requires a nanny to assist while working. Section 3.06(A) of the Michigan Child Support Formula allows for consideration of "actual" child care expenses and allows for inclusion of additional expenses related to the need for a child care provider to "retain a slot for a child without regard to whether the child actually attends." While Defendant may have an increase in parenting time, this does not mean that Plaintiff is not incurring childcare expenses. The Court reviewed the evidence, required updated documentation regarding childcare expenses because of the amount of time that has passed since evidence was provided to the Court, and allowed the expense in accord with the Michigan Child Support Formula. Of note, the Court also allowed Defendant to provide anticipated childcare expenses, though he neglected to do so.

Defendant argues in relevant part that the trial court misapplied the formula because 2021 MCSF 3.06(A)(3) does not apply to in-home care. He maintains that, by referring to "retaining a slot," the manual limits the additional expenses to expenses that would be incurred in an institutional setting. Defendant's interpretation strains the language of the formula.

The subsection at issue establishes that when "calculating child care expenses," the trial court must ordinarily presume that the parents are following the court's parenting-time orders. 2021 MCSF 3.06(A)(3). In context, that means that the trial court should only calculate a childcare obligation on the basis of childcare that would be required when the child was under a particular parent's care. It then provides an exception to that presumption: "However, if a child care provider requires payment to retain a slot for a child without regard to whether the child actually attends, include those additional costs." 2021 MCSF 3.06(A)(3). Nothing within this exception refers to childcare in an institutional setting. The exception instructs the trial court to include the "additional costs" for childcare without regard to whether the child "attends" the childcare if the "child care provider requires payment to retain a slot." 2021 MCSF 3.06(A)(3).

The term "slot" in this context refers to reserving a place within the childcare organization or according to the childcare arrangement; it does not limit application of the exception to a placement outside the home. See *Merriam-Webster's College Dictionary* (11th ed). Moreover, a child can "attend" childcare in a variety of settings, which includes his or her own home. Finally, the phrase "requires payment" cannot be read to limit the exception to those instances in which the childcare provider has a formal requirement. There need only be evidence that the childcare provider would be unable or unwilling to retain the "slot" for the child's care without the extra payment. With this construction in mind, it cannot be said that the trial court misapplied the law when it determined that plaintiff's nanny was a childcare provider who required payment to maintain DKB's "slot" within the childcare arrangement that she made with plaintiff. See *Borowsky*, 273 Mich App at 672.

On appeal, defendant questions whether the trial court correctly found that plaintiff needed childcare. He notes the evidence that plaintiff's mother lived in plaintiff's home and provided care in addition to the nanny. Defendant also points out that plaintiff repeatedly emphasized at trial that her schedule was flexible and allowed her to provide care for DKB. He additionally emphasizes that plaintiff herself presented evidence that the nanny did not generally provide childcare but instead provided housekeeping services. The evidence that defendant cites does not establish that plaintiff's nanny did not provide childcare or that her services were not reasonably necessary for plaintiff to maintain her employment. Rather, the testimony and evidence supported the trial court's findings and determinations.

Plaintiff's nanny testified that plaintiff hired her directly and that she performed a variety of tasks to help with DKB's care, which included care when plaintiff was away at work or out for other reasons. She stated that she was given a "permanent" position after a trial period and "bonded" well with DKB. The nanny indicated that she also covered for plaintiff when plaintiff was working at home and served as DKB's playmate on weekends. The nanny worked fewer hours when DKB went to defendant's house. She also informed the court that she needed a job that provided at least "30 hours" a week.

Plaintiff does not have a traditional 9 to 5 job; she has a highly demanding professional career, which includes obligations that might occur at various times throughout the day. Further, although there was evidence that the nanny performed many tasks that one might fairly characterize as household chores—such as washing DKB's clothing and bottles and cleaning up after meals—the evidence supported a finding that those same activities constituted an aspect of childcare. Stated another way, the chores that the nanny performed were the sorts of chores that a

parent would have to perform as a necessary component of childcare. By performing those aspects of childcare for plaintiff, plaintiff could devote the limited free time that she had between researching and performing her clinical duties to parenting DKB. Moreover, the record supported an inference that plaintiff's on-call demands would require childcare at odd times and with little notice. Accordingly, the trial court could reasonably find that a permanent, in-home nanny was necessary to ensure that plaintiff would be able to meet her work obligations whenever such an obligation might arise while DKB was in her care.

The record evidence also tended to support a finding that plaintiff had developed a relationship with DKB's nanny that made her dependable and ensured continuity in childcare, which plaintiff might not have been able to do without ensuring that the nanny had a reliable work schedule. The nanny's testimony that she "needed" 30 hours a week of work permitted an inference that she required that amount in order to accept direct employment as a nanny. Defendant's argument that it would be for a nanny or daycare service provider to find extra work if plaintiff did not need services for the requisite period ignores the evidence that plaintiff directly hired her nanny. Nothing in the MCSF requires a parent to obtain childcare through a service. Contrary to defendant's claims, the record supported the trial court's finding that plaintiff incurred actual, reasonable, predictable childcare expenses, and that those expenses were reasonably necessary to retain the childcare provider without regard to whether DKB was present on a particular day.

On this record, it cannot be said that the trial court clearly erred when it found that plaintiff needed to provide a fixed work schedule for the nanny in order to maintain a "slot" for DKB consistent with 2021 MCSF 3.06(A)(3). See *Stallworth*, 275 Mich App at 284. The evidence further supported the finding that the actual expenses were reasonable and predictable. Once the trial court made the requisite findings, it was obligated to include the actual childcare costs as a support obligation. See 2021 MCSF 3.01(A)(3); 3.06(A). Accordingly, the trial court did not misapply the law when it included those costs in the support order. See *Borowsky*, 273 Mich App at 672.

## C. SANCTIONS

### 1. STANDARD OF REVIEW

Finally, defendant argues that the trial court completely failed to address his request for attorney fees premised on plaintiff's misconduct and in so doing abused its discretion. This Court reviews for an abuse of discretion a trial court's decision whether to award attorney fees under its inherent authority as a sanction for unreasonable conduct. See *Borowsky*, 273 Mich App at 687. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Ford Motor Co v Dep't of Treasury*, 313 Mich App 572, 588; 884 NW2d 587 (2015). A trial court, however, necessarily abuses its discretion when it bases its decision on an error of law, see *Gay v Select Specialty Hosp*, 295 Mich App at 284, 291-292; 813 NW2d 354 (2012), or when it fails to exercise its discretion when called upon to do so, *Rieth v Keeler*, 230 Mich App 346, 348; 583 NW2d 552 (1998). This Court reviews the findings underlying a trial court's decision whether to award attorney fees for clear error. *Ford Motor Co*, 313 Mich App at 588. A finding is clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*.

-10-

## 2. ANALYSIS

When a person signs a document that he or she submits to a trial court, the signer certifies—in relevant part—that the document is "well grounded in fact and is warranted by existing law" and that it has not been "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." MCR 1.109(E)(5). If the trial court determines that the signer signed the document in violation of the rule, the court must impose an appropriate sanction on that person. MCR 1.109(E)(6). By requiring the trial court to impose a sanction that is reasonable, the Supreme Court gave trial court's considerable discretion to fashion an appropriate sanction. See *FMB-First Nat'l Bank v Bailey*, 232 Mich App 711, 727; 591 NW2d 676 (1998). Moreover, a trial court has inherent authority to sanction misconduct in addition to any authority granted by statute or court rule, which authority cannot be abridged by statute or court rule. *Persichini v William Beaumont Hosp*, 238 Mich App 626, 639-640; 607 NW2d 100 (1999).

On appeal, defendant argues that the trial court necessarily abused its discretion because it completely failed to address his request for attorney fees as a sanction for misconduct, as opposed to under the fee-shifting provisions set forth in MCR 3.206(D)(2) and MCL 552.13(1). Defendant's argument is not supported by the record.

The trial court was well aware that defendant claimed that he was entitled to his attorney fees as a sanction for misconduct by plaintiff during the litigation. Indeed, the trial court acknowledged as much in its amended opinion and order and addressed the request for attorney fees in two separate places within its opinion. The trial court first found that both parties—but especially plaintiff—had "engaged in aggressive litigation tactics that were neither necessary nor helpful" to the trial court. The court stated that because both parties engaged in such conduct, it would not "consider any reallocation of attorney fees in this case, or reallocation of debts incurred due to use of these tactics." The trial court reiterated the point in more general terms a few pages later: "Each party used their substantial income and assets to fund this litigation which included 20 days of trial over seven months, and each shall be responsible for their respective attorney fees. The Court finds no reason to reallocate fees in this case."

The trial court's finding that both parties engaged in aggressive litigation tactics that were not helpful to the court demonstrated that the court was not addressing fee-shifting under MCR 3.206(D)(2) or MCL 552.13(1) because those provisions do not permit general fee-shifting on the basis of unreasonable litigation tactics. Moreover, the trial court adequately stated a basis for declining an award of sanctions premised on the litigation, i.e., it believed that the proper remedy for the unreasonable litigation was to order both parties to bear their own legal fees. When those findings are considered along with the latter statement that the parties used their considerable income to "fund" the litigation, it is evident that the trial court found that both parties were culpable for the protracted litigation and the needlessly long trial, so neither party should be awarded attorney fees.

It might have been preferable for the trial court to specifically cite the law that underlay its decision to refuse to "reallocate fees," but it was not required to do so. It was sufficient for the trial court to make brief, definite, and pertinent findings and conclusions on contested matters without overelaboration of detail. See MCR 2.517(A)(2). A trial court's findings and conclusions

are sufficient when it appears to this Court that the trial court was aware of the issues, applied the law correctly, and when appellate review would not be facilitated by requiring further explanation. *Ford Motor Co*, 313 Mich App at 589. It is evident on this record that the trial court understood that it had the discretion to award attorney fees as a sanction for misconduct during the litigation—that is, under either its inherent authority or under MCR 1.09(E)(6)—and that it exercised its discretion by ordering that neither party would be given an award of attorney fees. This was therefore not a situation in which the trial court failed to exercise its discretion when called upon to do so. See *Rieth*, 230 Mich App at 348.

The record fully supported the trial court's finding that both parties engaged in excessive litigation, which dragged out the case and increased the expenses for everyone. On this record, the trial court's decision fell within the range of reasonable and principled outcomes. *Ford Motor Co*, 313 Mich App at 588.

## III. PLAINTIFF'S CROSS-APPEAL

### A. BEST-INTEREST FACTORS

#### 1. STANDARD OF REVIEW

For her first claim of error, plaintiff argues that several of the trial court's findings under the best-interest factors were contrary to the great weight of the evidence. This Court reviews a trial court's custody decision for an abuse of discretion. *Shulick*, 273 Mich App at 323. A finding of fact underlying a custody determination is against the great weight of the evidence when the evidence clearly preponderates in the opposite direction. See *Pennington*, 329 Mich App at 570.

#### 2. BACKGROUND LAW

When considering how to resolve the parties' custody dispute, the trial court had to consider the best-interest factors enumerated in MCL 722.23. See MCL 722.26a(1)(a). The trial court had to state its findings and conclusions for each of the factors listed in MCL 722.23 when rendering its custody determination. See *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 451-452; 705 NW2d 144 (2005). Although the trial court was not required to discuss every "piece of evidence entered" and every "argument raised" by the parties, the record "must be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings." *Id*. at 452. "A court need not give equal weight to all the factors, but may consider the relative weight of the factors as appropriate to the circumstances." *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006).

On appeal, plaintiff does not challenge the trial court's decision to award the parties joint physical and legal custody. Instead, she challenges the trial court's findings under the best-interest factors to the extent that the court relied on those factors in determining that the specific parenting-time schedule that it adopted was in DKB's best interests. The best-interest factors enumerated in MCL 722.23 are relevant to parenting-time decisions, along with the parenting factors stated in MCL 722.27a(7). *Shade v Wright*, 291 Mich App 17, 31; 805 NW2d 1 (2010).

-12-

## 3. FACTOR (c)

Plaintiff first argues that it was contrary to the great weight of the evidence for the trial court to find that best-interest Factor (c) favored defendant. Factor (c) concerns the "capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c).

In making her argument, plaintiff initially maintains that it was error for the trial court to find that she subjected DKB to a full-body search after every visit with defendant when the evidence in fact showed that it was defendant who engaged in such conduct. When discussing whether defendant's parenting time should be limited on the basis of plaintiff's claim that DKB was dysregulated after visits with defendant, the trial court noted that DKB seemed to be doing well despite the contentious divorce. The court noted too that there was evidence that DKB was not in fact extensively dysregulated after visits with defendant. The court stated in passing that GAL Janovic had described concerning behavior by plaintiff, which included Janovic's "impression that the minor child is subject to a full body check (stripped naked and inspected) each time he comes back from Defendant-Father's home."

Janovic testified about the concerning inspections when asked to clarify what she meant when she opined that the evidence tended to suggest that plaintiff had a "hovering" parenting style. She explained that she observed a parenting exchange in which DKB was immediately taken from the room upon arrival, stripped, and inspected. Janovic agreed that she did not actually see the inspection, but she related that plaintiff took DKB from the room and then returned after a time and whispered to her mother that DKB had a Band-Aid on him. She came to the conclusion that such inspections were common on the basis of reports that she recalled had come from plaintiff, plaintiff's mother, and plaintiff's nanny in which they "detailed every bug bite and bruise and scratch" that they observed on DKB.

Janovic's testimony permitted an inference that plaintiff inspected DKB after visits with defendant. Moreover, given the evidence that plaintiff had accused defendant of child abuse on the basis of minor injuries and had taken actions that led to investigations of defendant by Children's Protective Services (CPS), the trial court could reasonably conclude that plaintiff had in fact been inspecting DKB so that she could document any injuries that she discovered in order to support her claims against defendant. The evidence that defendant began to inspect DKB as well did not undermine the evidence that plaintiff's parenting had led to the dual inspection regimes with the concomitant stress that DKB experienced. Defendant explained that he too had begun to document injuries—which he did not report to anyone—in order to protect himself from plaintiff's litigiousness and from any further CPS reports.

To the extent that the trial court could be said to have found that plaintiff engaged in an inspection regime, which it then weighed against her when determining whether to restrict defendant's parenting time, the trial court's finding was not contrary to the great weight of the evidence. See *Pennington*, 329 Mich App at 570.

Plaintiff also faults the trial court for finding that she mischaracterized the emergency room's physician's statements to her when plaintiff took DKB to the emergency room to have an

injury treated. The trial court found that the emergency room physician, Dr. Suzanne Dooley-Hash, did not characterize DKB's injury as a burn or intentional injury, "as Plaintiff-Mother originally portrayed to this Court."

When read in context, the trial court's finding refers to plaintiff's insistence that the injury at issue amounted to intentionally-inflicted child abuse that warranted suspending defendant's parenting time rather than to an assertion that plaintiff mischaracterized Dr. Dooley-Hash's statements. In her emergency motion to suspend defendant's parenting time, plaintiff referred to the injury at issue as a burn that had been inflicted. She further stated that the emergency room physician told her that the injury was "not an accidental injury" and that the hospital staff called "Child Protective Services" and recommended that she contact her attorney. Plaintiff alleged that a CPS worker also characterized the injury as "not accidental" and urged her not to turn DKB over to defendant.

When read together, plaintiff's allegations suggested that the emergency room's staff and CPS worker had concluded that DKB's injury could not have been accidental, which necessarily suggested that it was intentionally inflicted. Indeed, she alleged that the injury was inflicted. Plaintiff further characterized the injury as a burn. As a whole, the trial court did not misstate that plaintiff originally portrayed DKB's injury as an intentionally-inflicted burn, which was unsupported by Dr. Dooley-Hash's testimony, or any other third parties' testimonies.

The evidence showed that DKB suffered three similar injuries over time. At trial, Dr. Dooley-Hash described the injury that she inspected as a fairly superficial abrasion that was from 1 to 2 centimeters in length. It was not a burn in her opinion. Dr. Dooley-Hash testified that she notified CPS because the injury was "suspicious and [DKB's] mother had concerns about that as well." Dr. Dooley-Hash's reference to plaintiff's concerns suggested that plaintiff had asserted that she was concerned that defendant might be abusing DKB. There was also evidence that plaintiff sent pictures of cigarette burns to the CPS investigator, which suggested that plaintiff was trying to influence the investigation. The CPS worker who investigated the allegations opined that the injury was very minor and determined that there was no evidence to substantiate the claims that defendant had abused DKB.

The evidence that DKB's injury was superficial permitted an inference that even a parent with no medical training could have treated the injury without the need to visit an emergency room. The fact that plaintiff took DKB to the emergency room for treatment, even though she was a highly-trained surgeon with a specialty in burns, suggested that she had an ulterior motive beyond a desire to seek medical care for DKB. Moreover, Dr. Dooley-Hash indicated that the staff contacted CPS in part because of plaintiff's concerns about abuse, which further supports the contention that plaintiff took DKB to the emergency room to develop a case against defendant. The CPS worker's testimony suggested that plaintiff mischaracterized the severity of DKB's injury. Examining the evidence as a whole, plaintiff arguably made allegations in her emergency motion that were not consistent with the underlying events. From that, the trial court could find that plaintiff did not accurately portray the severity and implications of DKB's injuries. Accordingly, plaintiff has not shown that the trial court's statements about her portrayal to the court—even if it could be fairly characterized as a finding—was contrary to the great weight of the evidence.

Plaintiff additionally complains that the trial court erroneously concluded that she misstated whether she was able to speak at pediatrician appointments when defendant was also present, along with erroneously faulting her for failing to follow the pediatrician's advice. Plaintiff claims that the overwhelming evidence showed that the parties had communication difficulties at the appointments and that plaintiff obtained conflicting advice about how to handle DKB's sleep disturbances.

The trial court stated that there was some question as to whether plaintiff made appropriate use of the healthcare system. In particular, the court indicated that there was no evidence to support her complaint that defendant's presence made it so that she was unable to communicate with the pediatrician. The court further related that plaintiff had the option to communicate with the pediatrician through the healthcare portal, which undermined her claim. The court noted too that plaintiff declined to follow the pediatrician's advice on handling DKB's sleep issues.

The context demonstrates that the trial court was addressing plaintiff's claim that defendant was in effect preventing her from communicating her concerns to the pediatrician. The trial court heard evidence that the pediatrician's staff had security present when the parties attended appointments at the same time because the tension between them was palpable. But there was evidence that plaintiff bore some of the blame for the problems during the appointments. Janovic stated that the staff reported that both parents talked over each other and that neither parent was the "aggressor" who could be assigned blame for the problem; rather, both parents appeared to dislike hearing the other talk. Janovic testified that the pediatrician did not feel that she was getting insufficient information about DKB and that both parents had the ability to receive updates and communicate with the pediatrician through the healthcare portal. Moreover, there was evidence that, although plaintiff felt that she was justified in doing so, plaintiff nevertheless disregarded the pediatrician's advice on handling DKB's sleep disturbances.

The evidence showed that DKB's sleep disturbances—which plaintiff repeatedly blamed on defendant—might, in part, be the result of plaintiff's nighttime parenting style. Specifically, Janovic observed that DKB got up more frequently at plaintiff's home because he knew he could get her attention and get her to entertain him. Janovic reported that the pediatrician wanted plaintiff to have DKB sleep in a different room in order to try something different and to see what would happen, but plaintiff refused. Furthermore, both the trial court and the GAL reviewed the parties' recordings of DKB's nighttime sleep habits, and there was no evidence that DKB experienced the level of distress that plaintiff and her cocaregivers reported that DKB exhibited after visits with defendant, which was consistent with defendant's reports.

From the totality of the evidence, the trial court could reasonably find that plaintiff was not using the appointments with the pediatrician to secure advice on how best to handle DKB's needs. Indeed, the evidence showed that she rejected the pediatrician's advice. From that, the trial court could find that plaintiff was using the appointments to garner support for her position that defendant should have less parenting time with DKB. Consequently, plaintiff has not shown that the trial court's finding that Factor (c) slightly favored defendant was contrary to the great weight of the evidence.

## 4. FACTORS (d) AND (e)

Plaintiff also argues that the trial court's findings on best-interest Factors (d) and (e) were contrary to the great weight of the evidence because the trial court failed to consider the importance of preserving stability for DKB, which, in her view, meant limiting defendant's overnight parenting time. Factor (d) addresses the "length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity," and Factor (e) examines the "permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(d) and (e).

In addressing these factors, the trial court recognized that both parents had adequate and appropriate housing in Ann Arbor, which they had both been using since DKB was little. The court noted that defendant wanted to exercise parenting time at his Boston residence as well, which appeared to be an appropriate and stable home. The trial court understood that defendant's proposed parenting time in Boston would effect a change in DKB's home life. For these reasons, the court found that neither party was favored under Factor (d) and that plaintiff was slightly favored under Factor (e).

Contrary to plaintiff's contention, the trial court explicitly recognized that there was an existing parenting framework with both parents that had become stable and which would be disrupted to some extent by allowing defendant to introduce DKB to a new home in Boston. Although plaintiff complains that the trial court's ultimate decision caused greater disruption than she would have liked, she has not identified any evidence to contradict the trial court's findings that both parents maintained stable homes. Plaintiff also has not identified any evidence demonstrating that the introduction of DKB to defendant's home in Boston would be so disruptive that it warranted weighing these factors more significantly in plaintiff's favor. In sum, plaintiff has not shown that the trial court's findings under these factors were contrary to the great weight of the evidence. See *Pennington*, 329 Mich App at 570.

## 5. FACTOR (f)

Plaintiff also argues that the trial court erred when it found that her credibility had been successfully challenged. Specifically, she claims that the trial court was mistaken when it supported its contention about her credibility by stating that plaintiff "minimized how often she was required to be at the hospital." Plaintiff maintains that the trial court further erred when it determined that she was being disingenuous about the disruptiveness that travel might have on DKB and when it criticized plaintiff's claims that defendant had neglected or abused DKB.

The trial court indicated that plaintiff's credibility had been successfully challenged as part of its discussion on the moral fitness of the parties under Factor (f). See MCL 722.23(f). Before making that observation, the trial court indicated that both parties had accused each other of moral weakness: defendant accused plaintiff of alienating him from DKB and making misrepresentations, and plaintiff accused defendant of domestic violence. The trial court concluded that the allegations by both parents were either not proven or not indicative of how well the other parent would function as a parent. For that reason, the trial court found that neither parent was favored under Factor (f).

As already discussed, there was significant evidence that plaintiff had exaggerated the nature and extent of DKB's injuries. The evidence also supported an inference that she used the emergency room visit to build a case against defendant and that her claim that the injuries were consistent with burns was not credible. The evidence concerning the allegations of abuse and neglect tended to undermine plaintiff's credibility, as the trial court indicated.

On appeal, plaintiff points to evidence that supported her claim that she had a fairly flexible schedule and did not have to be physically present at the hospital that often. The trial court, however, did not assert that there was no evidence to support plaintiff's position; it merely observed that plaintiff had minimized her work commitment even though common sense dictated that her job actually involved a demanding workload. It also noted that her position on her work demands was inconsistent with the evidence that she needed day- and night-nannies to accommodate her work needs.

Plaintiff admitted at trial that she submitted an affidavit in March 2020, which purported to list her work days since January 1, 2020, and yet omitted any days for February. Plaintiff explained to the trial court that—with that affidavit—she only intended to cover her workload for January 2020, but the trial court could infer that she had in fact been trying to minimize her work obligations.

In any event, the evidence showed that plaintiff had significant clinical and research obligations to the university and was on tenure track. There was also evidence that she hired nannies to assist her with childcare even though she also had family living in-home and assisting her. Considered together, the evidence permitted an inference that plaintiff had minimized her work obligations in an attempt to present her ability to parent in a more favorable light.

Finally, it was not improper for the trial court to rely on plaintiff's own admission that she had taken DKB on regular trips to Toronto when opining that plaintiff's claim that DKB could not handle a comparable trip to Boston lacked credibility. Plaintiff asserts that the trial court could not rely on that admission because DKB was much younger then, so the situation was not comparable. She also claims that the trial court erred when it stated that she wrote that the trips were monthly when in fact she reported that the trips were every six weeks.

Given plaintiff's extreme position on DKB's ability to handle travel with defendant, it was reasonable for the trial court to note plaintiff's inconsistent past behavior. Indeed, the trial court found it interesting that plaintiff wrote in the same questionnaire that she only ceased making those trips because of the pandemic, which suggested that she had had every intention of continuing regular long-distance travel with DKB. Plaintiff's admission suggested that her position on the harmful effects of travel depended in part on whether she was the one with the travel plans, which did implicate her credibility. The trial court's credibility observation also did not require the court to accept at face value (or even comment on) the other statements that plaintiff made in the questionnaire—such as whether she had recently decided to arrange playdates for DKB. The admission about travel implicated the credibility of plaintiff's position without regard to whether her other statements were true. Plaintiff has not shown that the trial court's finding that Factor (f) favored neither party was against the great weight of the evidence. See *Pennington*, 329 Mich App at 570.

-17-

## 6. FACTOR (j)

Plaintiff also disagrees with the trial court's finding that defendant was favored under Factor (j), which regards the "willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent," MCL 722.23(j), because plaintiff was less likely to support defendant's relationship with DKB. Plaintiff claims that the trial court's finding was contrary to the great weight of the evidence because the evidence demonstrated that she was not more litigious than defendant and that plaintiff suggested parenting times for defendant that were consistent with expert recommendations.

There was significant support in the record for the trial court's finding under this factor. The record showed that plaintiff's lawyer improperly slipped what amounted to a personal protection order into a mutual restraining order at the start of the litigation. As a result, defendant was compelled to negotiate parenting time with plaintiff, who retained substantial control over DKB until the trial court finally lifted the restrictions as erroneously granted. When defendant attempted to obtain more parenting time through the court, plaintiff reacted strongly and vigorously opposed any expansion of his parenting time. She also took actions that led CPS to investigate defendant, and she moved to suspend his parenting time on the basis of unsubstantiated claims.

Reviewing the record as a whole and considering the nature of the individual motions, the trial court could reasonably find that plaintiff was the more litigious of the parties and that her motions reflected a desire to limit defendant's relationship with DKB notwithstanding her protestations to the contrary. Consequently, plaintiff has not shown that the trial court's finding that this factor favored defendant was contrary to the great weight of the evidence. See *Pennington*, 329 Mich App at 570.

## 7. FACTOR (*l*) AND TRAVEL TIME

Finally, plaintiff argues that the trial court's finding that it was in DKB's best interests to travel to Boston on 16 weekends out of the year was contrary to the great weight of the evidence. Specifically, she claims that the trial court did not adequately consider the burden that travel would have on the child because it did not contemplate the amount of time spent traveling to and from the airport and in hotels.

The trial court examined the burden of travel on DKB under best-interest Factor (*l*), which allowed the trial court to consider any other factor relevant to the custody dispute, see MCL 722.23(*l*), and under MCL 722.27a(7)(e) (the court may consider the "inconvenience to, and burdensome impact or effect on, the child of traveling for purposes of parenting time"). The trial court found that it would be in DKB's best interests to have parenting time with defendant at defendant's home in Boston on a regular basis. The trial court provided that defendant would have parenting time in Boston on the second weekend of each month and on the fifth weekend of each month for those months that had a fifth weekend.

Although the trial court did not specifically analyze the amount of time that DKB would have to spend traveling, it is evident from the court's opinion that it thoroughly considered the costs and benefits of allowing defendant to have parenting time with DKB at his Boston home and

determined that it was in DKB's best interests to have the specified time in Boston, even though it involved the stress of airline travel. Moreover, none of the expert testimonies identified by plaintiff weighed so heavily against allowing travel at DKB's age that it could be said that the trial court's finding was against the great weight of the evidence.

Plaintiff has not established that any of the evidence preponderated against any of the trial court's findings. See *Pennington*, 329 Mich App at 570. Accordingly, she has not shown that the trial court abused its discretion when it established its parenting-time schedule. See *Shulick*, 273 Mich App at 323.

## B. IMPROPER DELEGATION OF AUTHORITY

Plaintiff next argues that the trial court improperly delegated its judicial authority to resolve disputes to the GAL. In her request for clarification filed in the trial court, plaintiff asked the trial court to remove Janovic as DKB's GAL because, in her view, Janovic was biased. She did not assert that the trial court improperly delegated its judicial authority to the GAL. Instead, plaintiff asked the court to stay the immediate effect of the first recommendation and asked for clarification about the GAL's role. Plaintiff again asked for clarification about the GAL after the court entered its first opinion but again did not challenge the trial court's authority to delegate tasks to the GAL or to give interim effect to the GAL's decisions. Plaintiff also did not raise the issue at the hearing on the various motions for clarification.

Because plaintiff never presented the trial court with the opportunity to rule on this issue, she waived this claim of error. See *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 2-3. Additionally, this claim of error does not involve the kind of exceptional circumstances that would justify this Court in reviewing the claim of error for the first time on appeal. See *Bailey*, 304 Mich App at 345-346. The trial court delegated certain tasks to the GAL because it anticipated from the parties' posttrial behavior that they were still not at a point at which they could compromise on even minor disputes. Nevertheless, the trial court specifically provided in its order that the GAL's resolution of any dispute between the parties would be binding only until "raised" with the trial court by filing an objection and asking for a hearing.

We are not convinced, given the entire record before us, that this was an improper delegation by the trial court. However, assuming for purposes of this opinion it was, under the order, any party can prevent any GAL recommendation from becoming binding by immediately challenging the decision in the court. There is also nothing to prevent plaintiff (or defendant) from asking the trial court to modify its order concerning the GAL on the basis of the claim that plaintiff now asserts on appeal—either in a challenge to a recommendation or in an independent motion. Accordingly, plaintiff can still provide the trial court with the opportunity to correct any error and make an appropriate modification to its order. For these reasons, we decline to exercise our discretion to review this unpreserved claim of error.

On appeal, plaintiff continues to claim that Janovic held a bias against her. But plaintiff does not argue that the trial court abused its discretion when it refused her request to remove Janovic as GAL and did not mention such a claim in the statement of her questions presented. Additionally, she has not identified the applicable law governing such a request. Consequently, we further conclude that, to the extent that plaintiff might be asserting a claim that the trial court

erred when it refused to remove Janovic for bias, plaintiff abandoned that claim of error on appeal. See *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019) (stating that a party abandons his or her claim of error by failing to list it in the statement of questions presented or by failing to adequately brief the claim of error on appeal).

## C. EXPERT WITNESSES

### 1. STANDARD OF REVIEW

We next address plaintiff's claim that the trial court abused its discretion when it ruled that four of her experts could not testify about the specific facts of this case. This Court reviews a trial court's decision to allow an expert to testify for an abuse of discretion. *Gay*, 295 Mich App at 290. A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Richards v Richards*, 310 Mich App 683, 699; 874 NW2d 704 (2015). This Court reviews de novo whether the trial court correctly selected, interpreted, and applied the law applicable to the admission of expert testimony. *Gay*, 295 Mich App at 291-292.

### 2. ANALYSIS

MRE 702 governs the admissibility of expert testimony, providing as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court serves as the gatekeeper who must ensure that the expert's proposed testimony meets the threshold requirements. *Gay*, 295 Mich App at 291. A trial court has broad discretion in determining whether a witness meets the requirements for offering expert testimony. *Id*. Nevertheless, the trial court cannot apply an overly narrow test of qualifications in order to preclude a witness from testifying as an expert. *Id*. The party proposing to call the expert bears the burden to show that his or her expert meets the qualifications. *Id*. at 293.

At trial, plaintiff proposed to call several experts to offer opinions about the proper resolution of the custody and parenting-time disputes, in addition to the experts on the division of the marital estate. Plaintiff called Dr. Ellen Barhal Taylor as an expert in child development. During voir dire, Dr. Taylor testified that she was not a neutral participant; she stated that plaintiff hired her to provide "divorce coaching"—more specifically, to help plaintiff "through the divorce process" by helping her to craft "good proposals, psychologically sound proposals that we thought would be helpful for [DKB]." Dr. Taylor stated that she formulated her opinions about what would be best for DKB nearly entirely on the basis of statements made by plaintiff. She never met DKB, and she did not review any of DKB's medical records.

After hearing voir dire, the trial court expressed concern about Dr. Taylor's ability to offer an opinion about DKB's best interests solely on the basis of information provided by plaintiff. The

court explained that the case was a very high-conflict case in which both sides had "two totally different stories." The court indicated that it did not think it would be helpful to the court as the finder of fact to hear an opinion that was premised on a one-sided view of the evidence. The trial court also stated that Dr. Taylor's testimony did not meet the requirement that her testimony be "based on sufficient facts and data and reliable principles and method." Nevertheless, the trial court stated that it would not be improper for Dr. Taylor to offer opinions on the basis of hypothetical facts. The trial court explained that Dr. Taylor could offer opinions premised on her understanding of a child's needs at DKB's age because that would not involve speculation about the facts.

Examining the trial court's ruling as a whole and in context, it is clear that the trial court carefully and reasonably applied the law to Dr. Taylor's proposed testimony. In order to offer an expert opinion about the specifics of this case, Dr. Taylor needed to have an evidentiary basis for her conclusions. See *Green v Jerome-Duncan Ford, Inc*, 195 Mich App 493, 498-499; 491 NW2d 243 (1992). Dr. Taylor conceded that she did not have a complete evidentiary basis for providing specific opinions, which called into question whether she could reliably apply her knowledge and skill to the specific facts of this case. See MRE 702. Indeed, it was not even clear that a professional in her position would offer an opinion under such circumstances. Nevertheless, the trial court recognized that Dr. Taylor had the requisite qualifications to testify as an expert and could provide helpful testimony on general principles of child development and on the proper consideration of facts assumed to be true in hypotheticals. On this record, the trial court did not abuse its discretion when it determined that it would not be helpful for Dr. Taylor to offer opinions premised on insufficient evidence, but that it would be helpful for her to offer opinions premised on general characteristics and hypotheticals. See *Richards*, 310 Mich App at 699. The same is true for the limits placed on plaintiff's other experts.

Dr. Haynes testified that he would normally conduct a comprehensive evaluation before offering an opinion on custody, but he stated that he did not review anything in the case before the court. Similarly, plaintiff's expert on child attachment, Jennifer Burke, testified that she did not review much information about the case because she was not "conducting a child custody evaluation" and was told that she would only be asked to testify about attachment theory generally. Because Dr. Haynes conceded that he did not conduct the kind of comprehensive review that would allow him to offer an opinion on the specifics of the instant case and Burke identified the limits of her own proposed testimony, the trial court cannot be said to have abused its discretion when it limited them to offering general opinions.

With respect to plaintiff's expert on domestic violence, Holly Rosen, she conceded that she had only reviewed a limited amount of evidence that was entirely one-sided. The court ruled that Rosen could testify generally about domestic-abuse dynamics but could not offer an opinion on the ultimate determination whether plaintiff was the victim of domestic violence. The trial court's decision to limit Rosen's testimony was consistent with the law.

Rosen testified that identical facts could give rise to different inferences depending on whether the facts involved the victim of domestic violence or the perpetrator of domestic violence. For example, she testified that abusers will sometimes use professionals—such as a pediatrician— to abuse their victims by proxy and limit the victim's freedom. Victims, therefore, may engage in gatekeeping strategies to protect themselves and their children from abuse by proxy. In the same

vein, Rosen stated that abusers sometimes ignore professional advice that does not correspond to their views because abusers feel that they are always right. Accordingly, in Rosen's view, evidence that a parent did not follow the advice of a professional, like a pediatrician, can be evidence that the parent who did not follow the advice was either a victim of domestic violence (i.e., if the parent was employing a gatekeeping strategy) or the perpetrator of domestic violence (i.e., if the parent refused to accept advice because he believed that he was always right). Stated another way, to apply Rosen's understanding of the evidence, one had to first identify the victim and the perpetrator. Indeed, Rosen made it clear that she would normally determine ahead of time who was the victim and who was the abuser; after all, it was her practice not to interview abusers because they lie "100 percent of the time." Notably, Rosen did not interview defendant.

An expert cannot offer an opinion that abuse occurred when the opinion has no independent basis in fact; in such a case, the expert's opinion amounts to nothing more than an assertion that he or she believes the alleged victim. See, e.g., *People v Thorpe*, 504 Mich 230, 255; 934 NW2d 693 (2019); *In re Castro*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 357656); slip op at 11. Rosen's opinion about the specific facts of the case would have amounted to an assertion that she believed plaintiff's version of events. Consequently, the trial court did not abuse its discretion when it limited Rosen's testimony to discussion of the general factors involved in domestic violence. See *Richards*, 310 Mich App at 699.

Plaintiff also complains that the trial court treated her unfairly when it allowed defendant's expert psychologist, Dr. Richard Wooten, to offer a specific opinion without reviewing plaintiff's evidence. Plaintiff's complaint is not well-taken. Dr. Wooten testified that he performed a comprehensive psychological examination of defendant using tests that he administered and that had been administered by another psychologist. He then offered expert opinions about the test results. There was nothing in the record to suggest that a psychologist cannot interpret the results of tests administered to a particular patient without first obtaining information from third parties. The trial court, therefore, properly distinguished Dr. Wooten's proposed testimony, which relied on sufficient facts and data, from the four experts offered by plaintiff who had insufficient familiarity with the facts of the case to offer a relevant expert opinion. See MRE 702. In sum, plaintiff fails to show that the trial court abused its discretion when it limited her four experts to offering general expert testimony.

## D. BROKERAGE ACCOUNT

### 1. STANDARD OF REVIEW

Plaintiff next claims that the trial court erred in its division of the marital estate. Specifically, she argues that the trial court erred when it awarded defendant the majority of an investment account identified as the account ending in 3299. This Court reviews the findings of fact underlying a trial court's division of the marital estate for clear error. *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992). A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made. *Beason v Beason*, 435 Mich 791, 805; 460 NW2d 207 (1990). The trial court's dispositional ruling is discretionary and should be affirmed unless this Court is left with the firm conviction that the division was inequitable. *Sands v Sands*, 442 Mich 30, 34; 497 NW2d 493 (1993).

## 2. ANALYSIS

The trial court had the authority to divide the property that came to either party by reason of the marriage. See MCL 552.19. A trial court normally cannot divide property between the spouses when the property belongs to one spouse as his or her separate property. See *Korth v Korth*, 256 Mich App 286, 291; 662 NW2d 111 (2003). "Thus, the trial court's first consideration when dividing property in divorce proceedings is the determination of marital and separate assets." *Reeves v Reeves*, 226 Mich App 490, 493-494; 575 NW2d 1 (1997).

Marital property is property that was acquired or earned by the parties during the marriage and, with certain exceptions, separate property is property that either spouse obtained or earned before the marriage. *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). An increase in the value of separately owned property during a marriage does not become a marital asset if the increase was not the result of either spouse's active efforts to improve the property's value. See *Dart v Dart*, 460 Mich 573, 585 n 6; 597 NW2d 82 (1999); *Reeves*, 226 Mich App at 496. An inheritance—even if received during the marriage—is separate property and retains its separate character if kept separate from the marital estate; it may become marital property, however, if commingled with marital funds and treated as marital property. *Cunningham*, 289 Mich App at 201, 208-209.

At trial, plaintiff conceded that defendant owned the account ending in 3299 from before their marriage and agreed that it had a balance of $355,740 at the start of the marriage. By the March after plaintiff filed for divorce, the account had a value of $1,258,624, and plaintiff's expert, Gary Rogow, opined that the increase in value ought to be treated as marital property, even though the account involved passive investments. More specifically, he maintained that defendant used some marital funds and commingled his separate funds in a way that justified treating the entire gain as marital property. Rogow agreed that defendant made only 13 relevant transactions involving that account during 2019, along with only 4 relevant transactions in 2020. Yet he believed that those transactions were so confusing that they amounted to the "poster child" for commingling.

Defendant's expert, Benjamin Bershad, disagreed that defendant commingled the funds in such a way that they had to be treated as marital property. He maintained that it was relatively easy to trace the funds used to purchase the stocks that were represented in the account ending in 3299. Bershad operated on the assumption that the proceeds from the sale of defendant's premarital home ($430,641), the gifts to him, and his inheritance were all defendant's separate property. He stated that those funds could then be traced to investments in the account ending in 3299. Finally, Bershad testified that, using the cost basis for the stocks reflected in the account, he could trace the increase in value that was directly attributable to defendant's separate property. Bershad testified that the value of the account, which could be directly traced to defendant's separate property, was $1,026,269. The trial court found Bershad's testimony credible and determined that all but $65,936 of the investment account was defendant's separate property.

On appeal, plaintiff argues that the trial court erred when it relied on Bershad's testimony and found that the account was mostly defendant's separate property. She maintains that the trial court should instead have believed her expert's testimony. Both experts gave reasoned testimony concerning the degree to which the investment account should be treated as defendant's separate

property. The trial court could, for that reason, have relied on either expert's testimony. The trial court found Bershad's testimony more credible. This Court gives special deference to a trial court's credibility determinations in resolving factual disputes. *Johnson v Johnson*, 276 Mich App 1, 11; 739 NW2d 877 (2007). And there is no basis in the record for second-guessing the trial court's decision to give greater weight and credibility to Bershad's opinion regarding the investment account. Plaintiff has not shown that the trial court clearly erred when it found that all but $65,936 of the value of the investment account was defendant's separate property.

## E. RETROACTIVE CHILD SUPPORT

### 1. STANDARD OF REVIEW

For her last claim of error, plaintiff argues that the trial court erred when it refused to make the child support order entered on the judgment of divorce retroactive to the filing of her complaint and that it erred in its support calculations. This Court reviews de novo whether the trial court properly interpreted and applied the provisions of the MCSF and any child support statutes. *Borowsky*, 273 Mich App at 672. To the extent that a trial court has discretion under the MCSF, this Court reviews the trial court's exercise of that discretion for abuse. *Id*. A trial court abuses its discretion under the MCSF when its decision falls outside the range of reasonable and principled outcomes. *Id*. Finally, this Court reviews for clear error the trial court's findings underlying its application of the law. *Id*. A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court made a mistake. *Stallworth*, 275 Mich App at 284.

### 2. ANALYSIS

A trial court presiding over a divorce action has the authority to enter an interim order for child support. See MCL 552.15; see also MCR 3.207(C)(1) (allowing a party to a domestic relations action to seek a temporary order at any time during the pendency of the case). Plaintiff asked for child support in her complaint, but she did not formally move for child support, and the trial court never entered an interim order for support. Moreover, on appeal, plaintiff does not argue that the trial court abused its discretion or otherwise erred when it failed to enter an interim order for support. Rather, she maintains that the trial court should have ordered defendant to pay child support retroactive to the filing of her complaint once it elected to enter a support order at the conclusion of the trial.

A support order—whether part of a judgment or as an order in a domestic relations matter—is a judgment with all the attributes of a judgment of this state on and after the date it is due. MCL 552.603(2). The support ordered in a child support order may not be retroactively modified except to the date of notice in the petition to modify an existing support order. *Id.* Notably, the Legislature provided that the prohibition against retroactive modification did not apply to an "interim support order or a temporary support order." MCL 552.603(3).

In this case, there was no interim or temporary support order, which could be modified consistent with MCL 552.603(3); the order in February 2022 was the first order compelling the payment of child support and thus there was no earlier petition to modify support. Although the trial court suggested that it had the discretion to award retroactive support, it did not have that

authority under MCL 552.603(2). Accordingly, the trial court did not err when it refused to order defendant to pay support retroactive to before the date of the first order for child support.

In relation to calculating child support, plaintiff argues that the trial court erred by using her most recent income, by using an average of defendant's income over two years, and by excluding certain one-time payments made to defendant. Plaintiff has not presented any evidence that defendant's most recent income changed. She also does not discuss the fact that the trial court excluded $38,000 in one-time payments because the record showed that those payments did not represent regular income to defendant. She also ignores the evidence that the trial court averaged the two years income, in part, because defendant took a larger than normal required minimum distribution from his investment retirement account (IRA) in 2019 and took no minimum distribution in 2020. Bershad testified that the normal required distribution would be about $25,000 a year. Taking this amount into consideration, he opined, would more accurately reflect defendant's annual income.

The goal of assessing a parent's income is to determine the amount of "money a parent should have available for support." 2021 MCSF 2.01(B). To that end, "[a]ll relevant aspects of a parent's financial status are open for consideration when determining support." *Id.* For that reason, the formula generally allows for consideration only those funds that "represent regular income." See 2021 MCSF 2.01(C)(5). The trial court could, for that reason, properly exclude one-time payments that did not adequately capture the amount of money available to defendant to support his child. Additionally, the evidence supported the trial court's conclusion that defendant's required distributions from his IRA would be $25,000 a year rather than the $50,000 that he took in one year. The trial court did not clearly err when it found that defendant's income did not include the one-time payments and should include only $25,000 a year in IRA distributions. See *Stallworth*, 275 Mich App at 284. The trial court also had the discretion to average multiple years of defendant's income to reduce the distorting effects from fluctuations. See 2021 MCSF 2.02. Plaintiff has not shown that the trial court abused its discretion when it averaged defendant's income for the relevant period. See *Borowsky*, 273 Mich App at 672.

Finally, plaintiff asserts that the trial court miscalculated the number of overnight visits. She offers a single sentence to that effect. She does not address the applicable law and does not demonstrate how she calculated the overnight visits. Plaintiff also has not provided a comparison of her method with that used by the trial court. For these reasons, we conclude that plaintiff abandoned this claim of error by failing to offer any meaningful citation of law or analysis of the actual calculation and a comparison to the parenting-time order. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). Plaintiff has not identified any errors in the trial court's calculation of child support that warrant relief.

## IV. CONCLUSION

We hold that the parties have not identified any preserved errors that warrant relief. Accordingly, there is no basis to disturb the trial court's rulings.

-25-

We affirm.  We decline to tax costs under MCR 7.219.

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado